# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | |
| | ) | Case No. 03-75819-SCS |
| LOLA P. THOMPSON, | ) | |
| | ) | |
| *Debtor.* | ) | |
| _____ | ) | |
| | ) | |
| LOLA P. THOMPSON, | ) | |
| | ) | APN 04-7148-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NEW MEXICO STUDENT LOAN | ) | |
| GUARANTEE CORPORATION, | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

This matter came on for trial on April 5, 2005, on the *Pro Se* Plaintiff's Complaint to Determine Dischargeability of Debt of certain student loans ("Complaint"), and upon the hearing on the Court's reopening of the evidence conducted on June 15, 2005. At the conclusion of the hearing on June 15, 2005, the Court took the matter under advisement. The Court has jurisdiction over these core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409(a). Upon consideration of the evidence and arguments presented at the trial and of the pleadings

submitted by each party, the Court makes the following findings of fact and conclusions of law.

## I.

### PARTIES AND PROCEDURAL HISTORY

The Debtor and *Pro Se* Plaintiff in this matter, Lola P. Thompson ("Thompson"), filed an individual Chapter 7 voluntary petition on August 12, 2003. The Court's Docket reflects that on October 28, 2003, the Chapter 7 Trustee assigned to Thompson's bankruptcy case filed a "Report of No Distribution" and Thompson subsequently received a discharge of her dischargeable debts on December 3, 2003.

On August 15, 2004, Thompson filed a Motion to Reopen Bankruptcy Case, which was granted by this Court. On September 28, 2004, Thompson filed an adversary proceeding against Premiere Credit of North America, LLC ("Premiere"), praying that her student loans be discharged. Thompson alleged in it that in order to finance her education at New Mexico Institute of Mining & Technology ("New Mexico Tech"), she secured a student loan from the New Mexico Educational Assistance Foundation ("NMEAF"). Thompson asserted that repaying these student loans would constitute an undue hardship. *See* Pl. Compl., p. 1. Accordingly, Thompson requests of this Court a discharge due to the undue hardship associated with repaying her student loans.

On November 5, 2004, an Answer to Thompson's Complaint was filed by New Mexico Student Loan Guarantee Corporation ("NMSLGC"). In its Answer, NMSLGC alleged that the named Defendant in this matter, Premiere is a collection agency under contract with NMSLGC, and that although NMSLGC was not named by or served in

Thompson's Complaint, that NMSLGC was the real party-in-interest.  *See* Def. Answer,

p. 1.

The Pretrial Conference in this proceeding was set for December 2, 2004, at which

time, both Thompson and counsel for NMSLGC appeared.[1]  NMSLGC was subsequently

substituted as the real party-in-interest in place of Premiere on December 15, 2004.[2]  At

the Pretrial Conference, various standard discovery deadlines were set and the final trial

date to determine the dischargeability of Thompson's student loan debts was set for April

5, 2005.[3]

---

[1]  Appearing on behalf of NMSLGC at the Pretrial Conference were Kenneth A. Moreno, serving as Associate Virginia Counsel pursuant to Local Bankruptcy Rule 2090-1(E), and Reginald J. Storment, a member represented to be in good standing of the New Mexico Bar and General Counsel for NMSLGC.  Def. Mot. to Appear *Pro Hac Vice*, p. 1.  Mr. Storment was subsequently admitted to appear before this Court, *Pro Hac Vice*, for the limited purpose of representing NMSLGC in the resolution of this matter, by this Court's Order, entered December 15, 2004.

[2]  NMSLGC was substituted as a defendant in this adversary proceeding by this Court's Order on December 15, 2004, and is the sole remaining defendant.

[3]  This Court's Pretrial Order, entered December 2, 2004, required all discovery to be completed by the parties on or before March 7, 2005.  On February 23, 2005, NMSLGC filed with this Court a Motion to Compel Discovery, alleging that on January 6, 2005, counsel for NMSLGC mailed to Thompson the following: (1) *Defendant's First Set of Interrogatories to Plaintiff*, (2) *Defendant's First Request for Production of Documents to Plaintiff*, and (3) *Defendant's First Request for Admissions to Plaintiff*, and that Thompson had not responded to any of these items by the February 9, 2005 deadline.  This Court subsequently held a hearing on the Motion to Compel on March 10, 2005.  At this hearing, both Thompson and counsel for NMSLGC appeared.  This Court granted the Motion to Compel orally ordering Thompson to provide full and complete answers to NMSLGC's discovery documents on or before March 16, 2005.  This Court also extended NMSLGC's responsive discovery deadline to March 31, 2005.  Finally, this Court extended the deadline for all parties to file Exhibit and Witness lists with the Court to April 1, 2005.  This ruling was memorialized in its entirety as an Amended Pretrial Order, entered March 14, 2005. Both parties complied with the Amended Pretrial Order.

The trial in this matter was held on April 5, 2005.  Thompson was the sole witness

called by either party.[4]  At the conclusion of the trial, an additional issue was brought to

_____

[4]  Prior to trial, Thompson filed 52 exhibits with the Court.  Exhibits 1 through 30 and 34
through 52 were not objected to and were deemed admitted at the outset of the trial.  Exhibits 31,
32, and 33 were objected to by NMSLGC at the outset of the trial.  Tr. at 5-6.  The Court
reserved ruling on the admissibility of the remaining three exhibits until the end of Thompson's
case-in-chief.  At the conclusion of Thompson's evidence, the Court overruled NMSLGC's
objection and admitted Exhibits 31, 32, and 33 as relevant.  Tr. at 61, 70-71.  Counsel for
NMSLGC presented 6 exhibits (hereinafter referenced as "Defense April 5, 2005 Exhibit"),
which were not objected to by Thompson and were deemed admitted by the Court.  Tr. at 6-7.
    Plaintiff's Exhibit 1 is Thompson's Employment History since May, 1972.  Plaintiff's
Exhibit 2 is a list of the jobs Thompson has applied for since being terminated by her last known
employer, Towers Perrin.  Plaintiff's Exhibit 4 is Thompson's Federal Income Tax Return for
2004.  Plaintiff's Exhibit 5 is Thompson's State Income Tax Return for 2004.  Plaintiff's Exhibit
6 is Thompson's Federal Income Tax Return for 2003.  Plaintiff's Exhibit 7 is Thompson's State
Income Tax Return for 2003.  Plaintiff's Exhibit 8 is Thompson's Federal Income Tax Return
for 2002.  Plaintiff's Exhibit 9 is Thompson's State Income Tax Return for 2002.  Plaintiff's
Exhibit 10 is Thompson's Federal Income Tax Return for 2001.  Plaintiff's Exhibit 11 is
Thompson's State Income Tax Return for 2001.  Plaintiff's Exhibits 12(a)-(v) are Thompson's
pay stubs from Towers Perrin.  Plaintiff's Exhibit 16 is Thompson's Unemployment Monetary
Determination of $326.00 per month for twenty six (26) months beginning November 14, 2004,
from the Virginia Employment Commission.  Plaintiff's Exhibit 22 is the promissory note for
$4,200.00 on Thompson's 401(k) loan.  Plaintiff's Exhibit 23 is the notice of payoff of
Thompson's 401(k) loan.  Plaintiff's Exhibits 24(a)-(d) are copies of Thompson's express
payday loans.  Plaintiff's Exhibit 31 contains copies of Thompson's various medical
prescriptions for depression.  Plaintiff's Exhibit 40 is an Order of Withholding from Earnings
from Premiere to Towers Perrin, issued June 18, 2004.  Plaintiff's Exhibit 41 is a Release of
Order of Withholding from Earnings, issued on November 1, 2004.  Plaintiff's Exhibit 42 is
Thompson's Charge of Discrimination filed with the Equal Employment Opportunity
Commission, filed on October 12, 2004.  Plaintiff's Exhibit 43 is a compendium of e-mails
outlining the grounds for Thompson's eventual termination from Towers Perrin, dated October
6-7, 2004.  Plaintiff's Exhibit 45 is the Virginia Employment Commission's Notice of
Determination for Benefits: Claimant Disqualified.  Plaintiff's Exhibit 46 is Thompson's Appeal
to Claimant Disqualification.  Plaintiff's Exhibit 47 is the Virginia Employment Commission
Appeals Examiner's Determination to reverse the previous ruling.  Plaintiff's Exhibit 51(a) is the
Order issued October 19, 2001 in Virginia Beach Circuit Court regarding Thompson's civil
litigation resulting from her car accident.  Plaintiff's Exhibit 51(b) is the letter sent by
Thompson's trial counsel explaining her jury award of zero ($0) dollars in the civil action
resulting from her car accident.
    Defense April 5, 2005 Exhibit A is NMSLGC's Complaint for Debt and Money Due filed
in the Second Judicial District Court, Bernalillo County, New Mexico, CV-90-03182, on March
13, 1990.  Defense April 5, 2005 Exhibit B is the Summons and Affidavit/Return of Service in
the same matter.  Defense April 5, 2005 Exhibit C is the Affidavit of Service by Mail in the same
matter.  Defense April 5, 2005 Exhibit D is the Certificate of Intent to Prosecute in the same
matter.  Defense April 5, 2005 Exhibit E is the Certificate as to the State of the Record and Non-

the Court's attention by NMSLGC.  Counsel for NMSLGC represented to the Court that

the New Mexico state court judgment against Thompson was no longer in existence,

having been both time-barred under state law and having been set aside by the New

Mexico state court of record.  After an extensive discourse with the Court, counsel for

NMSLGC conceded to the Court that absent the provisions of the Higher Education Act

of 1965 ("HEA"), NMSLGC would not have a basis to enforce its right of collection

against Thompson.  The Court provided NMSLGC thirty days to provide a written

memorandum in support of its position as to this limited issue only.  The Court also

afforded Thompson a period of time to respond.  Upon receipt of the additional briefed

materials, the Court determined, *sua sponte*, that there was an insufficient evidentiary

record upon which to base any findings as to this additional issue and ordered that the

evidence be reopened solely as to this new issue.

By its Order dated May 12, 2005, this Court ordered each party to submit all

evidentiary materials pertaining to the HEA issue.[5]  An evidentiary hearing on the HEA

---

Appearance of the Defendant in the same matter.  Defense April 5, 2005 Exhibit F is the 2005
U.S. Department of Health and Human Services Poverty Guidelines.

[5] More specifically, the Court ordered additional evidence on the limited issues of: (1)
Any and all pertinent documentation which verifies, provides the basis for, or supports the
alleged sale and purchase or otherwise transfer, of Plaintiff Lola P. Thompson's student loan
debt documented by promissory notes submitted to this Court as Exhibit A, from NMEAF to
NMSLGC; (2) Evidence of the state court judgment obtained in the matter of New Mexico
Educational Assistance Foundation v. Lola P. Thompson, in the Second Judicial District Court,
County of Bernadillo, State of New Mexico, No., CV 90 03182; and (3) Evidence of the alleged
release of said state court judgment, indicating the date and release and the party affecting the
release.  *See* Order, May 12, 2005, p. 2.

issue was held on June 15, 2005.[6]  At the conclusion of this hearing, the Court closed the

evidence and took the matter under advisement.

## II.

## FINDINGS OF FACT

Thompson has had an unfortunate and traumatic life and suffers from

longstanding, serious personal and professional instability.  Due to the nature of the issues

presented in this matter, it is regrettably necessary for the Court to go into some detail of

the events of Thompson's past.  The facts of this case are largely undisputed.

## A.

## Education and Student Loan History

Thompson is a fifty-five year old woman who has obtained four secondary degrees

since 1972.  Thompson obtained a Bachelor of Science Degree in Biology from New

Mexico Tech in Socorro, New Mexico, in 1972.  Pl. Ex. 1.  Thompson then went on to

receive a Master's Degree in Guidance Counseling from Iowa State University in Ames,

Iowa, in 1975.  *Id.*  In 1982, Thompson received a one-year computer certification from

---

[6] At this hearing, NMSLGC submitted six additional exhibits (hereinafter referenced as
"Defense June 15, 2005 Exhibit") to the Court and called one witness, Sarah Branch, Executive
Vice President of NMSLGC and Vice President of NMEAF.  Thompson presented the Court
with no additional exhibits and called only herself to testify.

Defense June 15, 2005 Exhibit A is a copy of the Default Judgment garnered against
Thompson in New Mexico state court.  Defense June 15, 2005 Exhibit B is the Order to Set
Aside Judgment and Dismiss Case in the same matter.  Defense June 15, 2005 Exhibit C is the
Agreement between NMSLGC and the U.S. Secretary of Education for Federal Reinsurance of
Loans.  Defense June 15, 2005 Exhibit D is the Educational Loan Guarantee Agreement between
NMSLGC and NMEAF.  Defense June 15, 2005 Exhibit E is the Agreement for Participation in
the Guaranteed Loan Program between NMEAF and the U.S. Secretary of Education.   Defense
June 15, 2005 Exhibit F is the Lender Application for Claim Payment re: Lola Thompson.

Globe College of Business in St. Paul, Minnesota. *Id.* Finally, Thompson returned to

Socorro to obtain another Bachelor of Science Degree from New Mexico Tech in

Computer Science. *Id.* In order to realize the fourth and final of these advanced degrees,

Thompson obtained financing in the form of student loans from NMEAF.[7] Thompson

attended New Mexico Tech from August 1983 until her graduation in May 1987, and

borrowed approximately $16,539.00 in student loans from NMEAF over this four year

period to finance this portion of her education.[8] Thompson's student loan from NMEAF

was secured by nine separate promissory notes, dated from August 22, 1983 to October 2,

1986. Def. April 5, 2005 Ex. A, p. 3-20.

**B.**

**Bankruptcy Creditors and Claims**

Thompson filed for Chapter 7 bankruptcy in the United States Bankruptcy

Court for the Eastern District of Virginia on August 12, 2003. In Thompson's Voluntary

Petition, she claimed only $3,500.00 in assets, of which she claimed $650.00 in exempted

personal property.[9] Liabilities, however, were a far different story. Through her Chapter

---

[7] NMEAF was the lender of Thompson's student loans. NMSLGC was the guarantor backing NMEAF's loan to Thompson. Counsel for NMSLGC explained that NMEAF, the lender, pursued repayment by the debtor for a specific period of time, then upon default by the debtor, NMEAF made a claim with NMSLGC, the guarantor backing the debt. This claim is evidenced by a paper trail which includes, among other documentary items, the payment history and a sample of the collection efforts that were pursued by the lender prior to the declared default. Then, NMSLGC reimbursed NMEAF for the majority of the principal and accrued interest of the loan. The guarantor is at that point the party-in-interest seeking repayment of the loan by the debtor. Tr. at 85-88; *see also* Def. June 15, 2005 Ex. F.

[8] Thompson alleged in her Complaint that she borrowed $25,000 to finance her four years at New Mexico Tech, but testified at trial that she had made a mistake in the Complaint in that calculation, and that the proper original loan amount, according to NMSLGC's Exhibit A, was $16,539.00. Tr. at 9-10; Pl. Compl., p. 1; Def. April 5, 2005 Ex. A.

[9] Thompson originally claimed $1,000.00 in assets, but amended her Schedules on October 24, 2004, to include an additional $2,500.00 in assets, representing her 1995 Pontiac

7 bankruptcy filing, Thompson was able to successfully discharge $33,762.00 in secured debt and $53,695.23 in unsecured nonpriority claims.[10]  It should be further noted that included in this $53,695.23 in discharged unsecured nonpriority debt, was at least $26,010.00 in discharged credit card debt and approximately $7,989.00 in discharged medical bills.[11]    Schedule J of Thompson's Chapter 7 petition lists her monthly expenditures to be $2,390.00.   Pl. Sch. J.   Thompson's expenses were listed on her Schedule J as follows:

| | | | |
|---|---|---|---|
| Rent or Mortgage Payment | | $ | 750.00 |
| Utilities: | Electricity heating fuel | $ | 125.00 |
| | Telephone | $ | 100.00 |
| | Cable/Internet | $ | 75.00 |
| Food: | | $ | 300.00 |
| Clothing: | | $ | 150.00 |
| Laundry and dry cleaning: | | $ | 60.00 |
| Medical and dental expenses: | | $ | 300.00 |

Grand Am automobile.  The $650.00 claimed by Thompson as exempt consists almost entirely of small household items, including various allotments for household goods and furnishings, clothing, and jewelry.  *See* Pl. Am. Sch. B; Pl. Sch. C.

[10]  Thompson claimed no unsecured priority claims, no executory contracts, and no unexpired leases.  Thompson's total amount of discharged debt was $87,457.23.

[11]  The remaining $19,696.23 in discharged debt included that owed to various collection companies, personal loans, department store debts, long distance bills, attorney fees, and apartment damage charges.  *See* Pl. Sch. F.  It should also be noted that although Thompson claimed that there were $134,081.95 in total unsecured nonpriority claims, this total included $80,386.72 in claimed student loan debt.  It appears to the Court that Thompson's student loan debt that is the subject of this litigation was listed twice in her petition as unsecured nonpriority claims in the name of NMSLGC's contract collection agency, Premiere, in the amounts of $40,000.36 and $40,386.36 respectively.  *Id.*

| | |
|---|---|
| Transportation (not including car payments): | $ 220.00 |
| Recreation, clubs & entertainment, newspapers, magazines, etc. | $ 100.00 |
| Automotive Insurance | $ 60.00 |
| Classes for ECO | $ 50.00 |
| Contingency Expense | $ 100.00 |
| | ------------------- |
| TOTAL MONTHLY EXPENSES | $ 2,390.00 |

## C.

## **Thompson History Prior to Student Loans**

Thompson grew up in an unusual household in New Orleans, Louisiana. Thompson was the oldest of eight children and apparently played a significant role in raising her siblings. Tr. at 15-16, 66. Thompson testified that growing up, she prepared their meals, got them ready for school, put them to bed at night, and otherwise served in a typically parental capacity for the other children in her family. *Id.* Thompson further stated that there were days when she actually had to stay home from school in order to take care of her younger brothers and sisters. *Id.* During her childhood, Thompson suffered a number of unusual experiences which may have adversely influenced her life as an adult.

Thompson left her home in New Orleans to attend college at New Mexico Tech in Socorro, New Mexico, in 1967. Tr. at 14-15. While Thompson was in college, she testified that she sent money home to her family, at her mother's behest. *Id.* The record is unclear as to where this money came from or as to how Thompson otherwise funded

her education and living expenses while obtaining this, the first of her two bachelor's degrees from New Mexico Tech.

Thompson received her Bachelor of Science in Biology from New Mexico Tech in 1972, and, upon graduation, returned to New Orleans.  Tr. at 15; Pl. Ex. 1.  Thompson remained in New Orleans for approximately fifteen months, unemployed for the first month, and then holding three separate jobs from June 1972 to September 1973.[12]  Tr. at 15; Pl. Ex. 1.

Thompson then left New Orleans and moved to Ohio in September 1973 to take a job as a Resident Counselor at Wilberforce University in Wilberforce, Ohio.[13]  Tr. at 15; Pl. Ex. 1.  Unfortunately, however, when a tornado hit Ohio, Thompson was forced to go back home to New Orleans.  *Id.*

Thompson testified that she was supposed to be home in New Orleans for approximately one month, but stayed for much less time because of a physical confrontation with her mother.  Tr. at 15-16.  Thompson stated that she attempted to leave New Orleans the next day after the confrontation, but was unable to do so because her mother had taken her car and all of her clothes, forcing her to stay in New Orleans and wait for her mother to bring her clothing back.  Tr. at 16-17.  Thompson further stated that she could not call the police and report her car as stolen because her mother was the

---

[12]  Plaintiff's Exhibit 1 suggests that she was employed as a "Car Sales Rep" at a car dealership from June 15, 1972 until September 1, 1972.  She was then employed as a secretary with the New Orleans Health Department from September 1, 1972 until March 1, 1973.  Finally, she was employed as a clerk typist at the New Orleans Criminal Courts Building from March 1, 1973 until September 1, 1973.  Pl. Ex. 1.

[13]  Thompson was offered this job in 1973 by her uncle, who was the Dean of Students at Wilberforce University.  Tr. at 15.

co-signer on the car loan.  Tr. at 17.  Thompson eventually got her clothes, but not her car back, and boarded a bus for Ames, Iowa, in June, 1974.  Tr. at 17; Pl. Ex. 1.  Thompson then entered Iowa State University in 1974 and received her Master's Degree in Guidance Counseling in August, 1975.[14]  Tr. at 17.

Thompson then moved to Kansas City, Missouri.  *Id.*  She was unemployed for approximately one month, during which time she rented a room from an elderly woman who allowed Thompson to stay rent-free until she was able to procure employment.  *Id.* Eventually Thompson got a job with the University of Missouri as an Academic Advisor, with a take home salary of approximately four hundred dollars per month.  Tr. at 18. Thompson held this job from 1975 until at least 1978.[15]  *Id.*

In 1978 Thompson began to get sick and testified that the doctors she visited were unable to tell her what was causing her ailing condition.  *Id.*  Thompson testified that this heretofore unexplained medical condition and the accompanying side-effects caused her to quit her job with the University of Missouri.  *Id.*

Thompson then began working as a substitute school teacher for the Kansas City Public School System.  *Id.*  Thompson was still sick, however, and she testified that again the doctor was unable to tell her what was wrong.  Tr. at 18-19.  A matter of days after visiting the doctor, Thompson testified that she collapsed in her home and was rushed to

---

[14]  Thompson also worked as a Research Assistant while at Iowa State.  Pl. Ex. 1.

[15]  It is unclear as to when Thompson actually ceased working for the University of Missouri.  Plaintiff's Exhibit 1 suggests that she worked there from September 15, 1975 until August 1, 1980.  However, her trial testimony suggests that she began working as a substitute teacher for the Kansas City Public School System shortly following the time illness befell her in 1978 and that she only worked at the University of Missouri for "almost three years," starting in 1975.  Tr. at 18.  Further adding to the confusion, it appears that Thompson may have moved to Minnesota as early as 1978 and then back again to Kansas City for a short time.

the hospital by ambulance. *Id.* After Thompson recovered, she resumed her post as a substitute teacher. *Id.* Unfortunately, about one year later, Thompson suffered yet another emergency surgical procedure. Tr. at 19; Pl. Compl., p. 7. After this surgery, Thompson, now twenty-nine years old, called her sister in New Orleans to come and get her to take her back home to New Orleans because she could not drive. Tr. at 20. However, much to Thompson's dismay, her estranged mother showed up to take her back to New Orleans instead. *Id.* Thompson testified that once she recovered from her surgery, she packed her belongings and wrote a bad check at the airport for a one-way ticket from New Orleans to Minneapolis, Minnesota. *Id.*

Life did not get any easier for Thompson when she moved to Minnesota, as she moved there in November and was forced to buy warmer clothes, boots, and a coat in order to survive the harsh Minnesota winters. Tr. at 20-21. At this time, she also bought a 1972 Dodge Dart that had no heater and was fraught with other mechanical troubles, including a freezing gas line, frequent dead batteries, and a leaking radiator. Tr. at 22-24. Also, during Thompson's first three years in Minnesota, it appears she continued to work at a variety of temporary jobs, generally doing data processing.[16] Tr. at 22; Pl. Ex. 1.

In January of 1982, Thompson enrolled in a one-year course of study at the Globe College of Business ("Globe") in St. Paul, Minnesota, where she studied computers. Tr. at 22. Even after obtaining her Certificate in Computer Programming from Globe in

---

[16] Thompson's Exhibit 1 suggests that during these Minnesota years, she relocated, without a job, back to Kansas City, Missouri for three months, from the beginning of October 1981 through the end of December 1981. The record is unclear as to whether this is accurate and/or what the purpose for this temporary relocation was. Neither Thompson's testimony, nor her Complaint make any reference to this relocation.

December 1982, Thompson was still apparently unable to procure permanent employment and remained in Minnesota for approximately seven more months.  Tr. at 23; Pl. Ex. 1.  In July 1983, Thompson left Minnesota due to her inability to get a permanent job, and returned to New Mexico.  Tr. at 23-24.

Thompson relocated back to Socorro, New Mexico in July, 1983, and re-enrolled at New Mexico Tech, where she had obtained her first bachelor's degree approximately eleven years prior, in order to begin work on a second bachelor's degree.  Tr. at 24.

### D.

### Thompson History After Student Loans

While enrolled at New Mexico Tech, Thompson worked part-time while attending classes full-time, year round.[17]  *Id.*  Thompson borrowed a total of approximately $16,539.00 over the four years that she was enrolled at New Mexico Tech.[18]  Tr. at 10.

Thompson graduated from New Mexico Tech in May of 1987 with a Bachelor's Degree in Computer Science.[19]  Tr. at 25-26; Pl. Ex. 1.  According to Thompson's Exhibit 1, she has held approximately twenty-five jobs since she graduated from New Mexico Tech.  At the time of her graduation, Thompson had neither a job, nor any job prospects. Pl. Compl., p. 2.  Nevertheless, she moved to Albuquerque, New Mexico, staying in a

---

[17]  Thompson worked approximately twenty hours per week in the University Computer Center as a "User Consultant."  Pl. Compl., p. 1.  She also worked as a Research Assistant 10 to 20 hours per week during her first-year.  *Id.*  During her last year, Thompson also worked part-time as a waitress.  *Id.*

[18]  Thompson testified that she only borrowed $2,500 her last year and worked a waitress to supplement her income further so as to minimize her student loan debt.  Tr. at 25.

[19]  Thompson testified that because she had an unpaid dorm bill when she graduated, she never received her final transcript, nor her actual degree from the University upon graduation. Tr. at 25.

shelter until she was able to find work.  Tr. at 26; Pl. Compl., p. 2.  During this time, Thompson found temporary work as a secretary and word processor for Manpower Temp Agency, earning $3.50 to $5.00 an hour, while working only 20 to 30 hours per week.  *Id.* Eventually, Thompson was able to find apartment housing, until she was evicted for bouncing a rent check.  Pl. Compl., p. 2.  Unable to support herself on part-time wages and suddenly without a residence, Thompson packed up her belongings and considered going back to her family in New Orleans in order that she may have a place to live.  Tr. at 26; Pl. Compl., p. 2.

However, Thompson was not forced to move back to New Orleans because her employer in Albuquerque apparently found her a job with his parent company, which was located just outside of Las Cruces, New Mexico.  *Id.*  Thompson remained in Albuquerque for a short time, renting a studio apartment on a weekly basis, and working part-time until the new position opened.  *Id.*

In October, 1987, Dynaspan Services opened just outside of Las Cruces, at the White Sands Missile Range in White Sands, New Mexico.  Tr. at 11; Pl. Ex. 1. Thompson moved to Las Cruces from Albuquerque, and began working for Dynaspan, earning approximately $20,000 per year, on a probationary basis to be re-evaluated at the end of a six-month period.

Thompson's student loan payments became due in January, 1988, while she was living in Las Cruces and working for Dynaspan at the White Sands Missile Range.  Tr. at 10-11.  Thompson made her first three student loan payments in early 1988.[20]  *Id.*

---

[20]  Thompson testified that she had no recollection of making those first student loan payments to NMSLGC until she was informed of such by NMSLGC during the course of

However, shortly thereafter, Thompson apparently stopped making her student loan payments altogether.  Tr. at 11.

At the conclusion of her six-month probationary period at Dynaspan, Thompson was placed on another six-month probationary period, which apparently enraged Thompson to the point that she quit Dynaspan and moved to Las Vegas, Nevada.[21]  Tr. at 11, 27; Pl. Ex. 1; Pl. Compl., p. 3.  Thompson testified before moving to Las Vegas, she stored most of her belongings, and virtually all of her possessions, including her furniture and clothing, were stolen.  Tr. at 12.

Once in Las Vegas, Thompson found temporary work with Citibank, Inc., imputing credit card payments.  Tr. at 27; Pl. Ex. 1.  Thompson remained with Citibank for less than two months, and began working for Reynolds Electrical & Engineering Company ("Reynolds"), a job she managed to hold for close to fifteen months.  *Id.* Thompson began working for Reynolds as a secretary in the Human Resources Department, but was eventually able to move up to the position of a computer programmer, which included a raise from approximately five dollars per hour to thirteen dollars per hour.  Tr. at 27; Pl. Compl., p. 3.

Thompson claims that even though she was now making approximately twenty-six thousand dollars per year with her promotion to computer programmer, she still apparently could not afford to repay her student loans: "My new salary was $26,000.00

---

discovery in the current litigation.  Tr. at 10.
    [21]  Thompson testified that her decision to move to Las Vegas was based on having seen advertisements that in Las Vegas "the cost of living was low and there was an abundance of jobs."  Tr. at 11.

per year, still not enough to make payments on my student loan and pay rent, utilities, buy

gasoline for my car, pay for the upkeep of my car, buy or rent furniture and buy clothes."

Pl. Compl., p. 4.

Thompson's new computer programming job required her to work at the Reynolds

Nevada Test Site, which was approximately seventy-five miles away from where she had

been working in Las Vegas.  Tr. at 27; Pl. Compl., p. 3-4.  Thompson testified that in

order to get to work at the test site each day she had to commute by bus.  Tr. at 27.  It

soon became apparent that this situation was not palatable for Thompson.  *Id.*  Thereafter,

in November, 1989, Thompson received a job offer from the State of Nevada Department

of Human Resources doing data processing, with a $6,000.00 per year pay increase.  Tr.

at 27-28; Pl. Compl., p. 4.  Thompson accepted this job, quit her job at Reynolds, and

moved to Carson City, Nevada.  Pl. Compl., p. 4.

Upon moving to Carson City, Thompson became depressed.  Pl. Compl., p. 4.

Thompson testified that she had previously been diagnosed with mental depression while

living in Minnesota and was once again diagnosed with mental depression while living in

Nevada.  Tr. at 62.  Also, NMSLGC was able to locate Thompson in Carson City.  Tr. at

28.  Thompson testified that she was served with a lawsuit filed by NMSLGC in New

Mexican state court arising out of her defaulted student loan payments on March 13,

1990.  Tr. at 28; Def. April 5, 2005 Ex. A-E.  Thompson filed no responsive pleadings

and made no appearance, and NMSLGC obtained a judgment against Thompson in the

amount of $26,095.69, including $6,497.42 in attorney's fees and $106.00 in costs, with

simple interest accruing at a rate of nine percent.  Tr. at 9-10; Def. April 5, 2005 Ex. A-E;

Def. June 15, 2005 Ex. A.  As a result, Thompson made three semi-voluntary student loan payments to NMSLGC in the amounts of $300.00 on June 8, 1992, $228.00 on June 24, 1992, and $260.00 on August 6, 1992.  Tr. at 28-29.

It was during this time period that Thompson testified she had become an alcoholic and a heavy gambler, and that she has no recollection of the four years spent in Carson City.  *Id.*  Thompson further testified that she had no recollection of having ever made these three payments to NMSLGC, and that her only knowledge of these payments came from discovery materials provided by NMSLGC in this litigation.  *Id.*

Thompson testified that during her time working for the State of Nevada, all she did was "go to work and go to the casino."  Tr. at 29.  In early 1994, Thompson quit her job with the State of Nevada, approximately four years after beginning work there, and checked herself into a Rehabilitation Center ("rehab"), suffering from depression and alcoholism.  Tr. at 29; Pl. Compl., p. 5.  Thompson remained in rehab for approximately three months.  Pl. Compl, p. 5.  After checking out of rehab, Thompson moved to Reno and lived in a shelter for approximately three weeks.  Tr. at 30.  Thompson was able to find work and moved into a house with what she described as four male alcoholics for roommates, and where she slept in a closet.  *Id.*

Given this precarious state of affairs, Thompson decided that she should finally call home to New Orleans.  *Id.*  By this time, it had been seven years since she had seen her mother and fourteen years since she had seen her father, sisters, or brothers.  Tr. at 29.  When Thompson called home, her family informed her that one of her sisters had moved to Los Angeles, California, and that she would come and get Thompson in Reno.  Tr. at

30.  Sometime in mid-1994, Thompson's sister flew out from California to get Thompson and bring her back to Los Angeles.  Tr. at 30; Pl. Compl., p. 5.  Thompson lived in Los Angeles for approximately six months and was able to find temporary work there as a data processor for a newspaper company for about two months, before moving back to New Orleans in November, 1994.  *Id.*

Thompson's car broke down on the way back to New Orleans and apparently did not make the remainder of the trip.  Tr. at 31.  Back in New Orleans, Thompson discovered that her parents had divorced after more than forty plus years of marriage.  *Id.* Initially, both Thompson and her sister stayed at her mother's home, but her sister found work immediately and moved out, while Thompson remained there for four to six more months.  Tr. at 31; Pl. Compl., p. 5.

Thompson testified that she developed high blood pressure from being around her mother and nieces that she did not know.  Tr. at 31.; Pl. Compl., p. 5.  Apparently at one point, there were at least twelve people living in her mother's three-bedroom home.  Pl. Compl., p. 5.  Thompson worked temporary jobs for five to six months before getting a computer job with CTA, Inc.  Tr. at 32.  This job lasted for seven months because, Thompson testified, the company lost its contract with the Navy, and in order to remain with the job, she would have had to relocate to North Dakota, which Thompson apparently was unwilling to do.  *Id.*  Thompson quit CTA and after approximately two more months of unemployment, began working for Strategic Concepts, Inc., where she stayed for only two months before going to work at Systems Engineering Management

Associates ("SEMA") on a probationary basis. *Id.* After Thompson's six-month probationary period with SEMA expired, she was terminated. *Id.*

Thompson again struggled financially through this period, going between bouts of unemployment and temporary work, to the point that she was forced to move in with her father, who, since the divorce from Thompson's mother, was living in an apartment in a low income area of the city. Tr. at 33; Pl. Compl., p. 5. After a couple of days of living with her father, the apartment was robbed. *Id.* Thompson testified that among the items taken, was her father's television, her television, their telephones, and virtually all of her clothing. Tr. at 33.

In late 1997, Thompson went to a job fair in New Orleans, where she interviewed with Unisys Corporation ("Unisys"). Tr. at 33; Pl. Compl., p. 5. Unisys offered Thompson a job two days later as a computer programmer, on the condition that she relocate to Virginia Beach, Virginia, which she did. Tr. at 33-34; Pl. Compl., p. 5.

During Thompson's three years in New Orleans, she held approximately nine to ten jobs, four of which were computer jobs and two of which paid $33,000 annually, but which only lasted for approximately six months each. Pl. Compl., p. 5. The remainder of Thompson's jobs in New Orleans were temporary jobs that paid her from $6.50 to $10.00 per hour. *Id.* During those times when Thompson was unemployed, she collected $77.00 a week in unemployment compensation. *Id.*

Thompson moved to Virginia Beach and began working for Unisys in November, 1997. Tr. at 34; Pl. Compl. 5-6. Thompson apparently enjoyed some success at Unisys because she received a five percent merit-based raise after six months on the job in

Virginia Beach.  Pl. Compl., p. 6.  She was then sent by Unisys to work in Chesapeake at

a Navy Installation and moved closer to her new work site.  Pl. Compl., p. 6.  Two weeks

after making this move to the Chesapeake site, Thompson was involved in an automobile

accident on her way to work in June, 1998.  Tr. at 35; Pl. Compl., p. 6.

Approximately three years after going to work with Unisys, Thompson's father,

who was seventy years old and suffering from diabetes and high blood pressure, had a

stroke.  Tr. at 35.  Between visiting her father for approximately a week and the physical

therapy she had to go through because of a car accident, Thompson had fallen behind in

her work and was placed on probation at Unisys in August, 2000.  Tr. at 35; Pl. Compl.,

p. 7.  Further, Thompson claims that the pain and the medication associated with her car

accident altered her personality at work, causing her to among other things, get

aggravated with co-workers.  Pl. Compl., p. 6.

Thompson stated that in addition to these issues pertaining to her father, going

through physical therapy, and being "harassed" by her supervisor, other problems she

faced at Unisys included difficulty with the programming language she was forced to

work with and finding out that her "co-workers were making a lot more money" than she

was making.  Pl. Compl., p. 6.  Whatever the ultimate reason, after three years at Unisys,

Thompson put her resume' on the Internet and found a job with Metro Information

Services ("Metro") for fifteen thousand dollars more per year than she was earning at

Unisys.  Tr. at 36.  Apparently, Thompson's departure from Unisys was not a cordial one.

Thompson testified that when she attempted to put in her two-week notice at Unisys, they

let her leave the very same day.  *Id.*  Additionally, Thompson has noted that she "burned

[her] bridges" when she left Unisys by calling her supervisor a "big liar."  Pl. Compl., p. 7.

Thompson began working for Metro on August 14, 2000.  Tr. at 36.  Three and a half weeks after starting with Metro, Thompson's father passed away on September 10, 2000.  Pl. Compl., p. 7.  Metro paid Thompson a starting salary of $55,000 per year, but she was laid off less than one year after beginning work, when Metro was sold to Keene, Inc.[22]  Tr. at 36; Pl. Compl., p. 7; Pl. Ex. 1.  About one month later, Metro/Keene called Thompson and offered her a position in Kansas City, Missouri.  Pl. Compl., p. 7.  Thompson turned this offer down for a variety of reasons, including, she claimed, because she had bad memories of Kansas City from her earlier stint there, she had become tired of moving across the country, and she could not trust that the job would be permanent.  *Id.*

Thompson, therefore, spent the next six months unemployed.  Pl. Compl., p. 7, Pl. Ex. 1.  Included amongst a rather long list of job applications was one with the Department of the Navy, working at the Naval Exchange, in which Thompson alleges after initially being told that she was going to be hired, she was not hired, apparently because she failed the Navy's standard personality test.  Pl. Compl., p. 7-8.  Once her unemployment compensation lapsed, Thompson found employment in Hampton, Virginia for approximately seven months.  Pl. Compl., p. 8.  This latest job was with a temporary employment service, Lee Temps, who placed her in a job working for Nextel

---

[22]  It is unclear when exactly Thompson was laid off.  It was either on July, 2001, as per her trial testimony, August, 2001, as per her Complaint, or September, 2001, as per Plaintiff's Exhibit 1.  Tr. at 36; Pl. Compl., p. 7; Pl. Ex. 1.

Communications ("Nextel") as a Customer Service Representative, at a rate of approximately $10.00 per hour. *Id.*

Lee Temps' policy involving temporary employees was that after six months at their job placement, the temporary employee was expected to apply for their position on a permanent basis with the company that they had been working for. *Id.* Rather than applying for a permanent position doing her current job, however, Thompson chose rather, to apply for a higher paying job with Nextel, which she did not get, and was consequentially laid off by Lee Temps. *Id.* When Thompson applied for unemployment benefits through the Virginia Employment Commission ("VEC"), she was told that she was ineligible because Lee Temps had reported that she had voluntarily quit her employment.[23] *Id.*

Thompson's stint at Lee Temps was followed immediately by another six weeks of unemployment. Pl. Compl., p. 7-8; Pl. Ex. 1. Thompson then managed to obtain and lose five jobs in thirty-four days, capped off by two more weeks of unemployment.[24] *Id.* In January, 2003, Thompson was able to obtain more stable employment with Towers Perrin Forster & Crosby ("Towers Perrin") in Chesapeake, Virginia, as a Benefits Analyst. Tr. at 40; Pl. Compl., p. 8-9; Pl. Ex. 1. Thompson testified that she spent her entire first paycheck from Towers Perrin on her January, 2003 rent and the associated court costs

---

[23] Thompson appealed the VEC's decision to the Appeals Examiner in December, 2002, and in February, 2003, the VEC's decision was reversed and Thompson was rewarded benefits and pay relating back to her October, 2002, termination date. Pl. Compl., p. 9; Pl. Ex. 45-47.

[24] According to Plaintiff's Exhibit 1, Thompson worked for Apple One Employment Services from 11/15/02 through 11/19/02; Manpower Temps on 11/21/02, Lillian Vernon from 11/22/02 through 12/05/02, International Marketing Associates from 12/08/02 through 12/11/02, and Education Resources from 12/12/02 through 12/18/02. Pl. Ex. 1.

that follow when eviction proceedings have been initiated.  Tr. at 40; Pl. Compl., p. 9.

Thompson spent her second paycheck on her February, 2003 rent.  *Id.*

Also during her time at Towers Perrin, Thompson began investing in and then

borrowing from a 401(k) savings plan, until she finally stopped contributing to the plan

altogether.[25]  Tr. at 40-41; Pl. Ex. 12(a); Pl. Ex. 12(b); Pl. Ex. 12(c); Pl. Ex. 22, 23.  After

paying her rent, her electric and phone bills, and buying food and gasoline for her car,

Thompson alleged that she had no remaining money to pay her credit card bills or any of

her other bills, and was beginning to get harassed by collection companies.  Pl. Compl., p.

9.  Thompson decided to file for bankruptcy in August, 2003.  *Id.*

Thompson received a discharge of her dischargeable debts on December 3, 2003.

Approximately eight months later, in July, 2004, NMSLGC, through its collection

agency, Premiere, began garnishing Thompson's wages at a rate of ten percent per pay

period.[26]  Tr. at 40; Pl. Compl., p. 9; Pl. Ex. 12(l)-(s); Pl. Ex. 12(t)-(v); Pl. Ex. 40; *see also*

Pl. Ex. 41.  Rather than allowing this garnishment of her wages to continue, Thompson

went to a commercial express payday advance loan company and borrowed money

against her Towers Perrin paycheck at an annual percentage rate ("APR") of 497.73% so

that she could afford to pay to file a motion with this Court to re-open her bankruptcy

---

[25]  Thompson borrowed $4,200.00 at 5.00% interest with a repayment plan of 12 semi-monthly payments of $354.76.  Pl. Ex. 22.  Thompson repaid her 401(k) in full on July 15, 2004. Pl. Ex. 23.

[26]  Thompson's take home pay for the six pay periods prior to the NMSLGC garnishment (April, May, and June, 2004) was approximately $990.35 per two-week pay period.  Thompson's garnished take home pay was approximately $830.73 per month until October, 2004.  Pl. Ex. 12(f)-(v).  During the months of October and November, 2004, Thompson's take home pay increased dramatically due, at least in part, to Thompson's working overtime.  Pl. Ex. 12(R)-(T). During three two-week pay periods in October and November, Thompson brought home net pays of $1,358.65, $1,284.76, and $1,338.81, respectively.  *Id.*

case and attempt to discharge her student loan debt to NMSLGC.  Pl. Compl., p. 9-10; Pl. Ex. 24.   Altogether, NMSLGC's garnishment of Thompson's wages while at Towers Perrin yielded $1,244.16 towards the student loan debt in a matter of only four months. Pl. Ex. 12(l)-(s).

In October, 2004, two months after filing her bankruptcy petition, Thompson was reprimanded in person and via confirmation e-mail by Towers Perrin for refusing work given her by management and for leaving work on at least two occasions without prior approval from management.   Pl. Ex. 43.   Less than one week after this reprimand, Thompson filed a discrimination complaint against Towers Perrin with the Equal Employment Opportunity Commission ("EEOC") of the United States government.   Pl. Ex. 42.  According to a series of documents provided to this Court by Thompson,[27] she alleged among other things, that her supervisor was biased in favor of the white employees, that she was being kept from advancing within the company, and that she was forced to use all of her sick leave because she became "physically sick" from being in the room with various other coworkers.  Pl. Compl. 5-7.  On November 18, 2004, Towers Perrin terminated Thompson's employment, apparently due to her newfound practice of regularly leaving work without prior approval.   Pl. Ex. TOC (description affixed to Exhibit 43 entry), 1, 43.

Thompson has been unemployed since being terminated by Towers Perrin in November, 2004.  Pl. Ex. 1.  After her termination from Towers Perrin, Thompson began

---

[27] Included with her Complaint, Thompson provided the Court with a series of e-mails, letters, and other forms of correspondence made between herself and various other Towers Perrin employees.  Pl. Compl. Ex. 5-7.

receiving $326.00 per week for a period of twenty-six weeks in unemployment compensation through the VEC. Pl. Ex. 16. Thompson's Exhibit 2 suggests that she has applied for approximately thirty-six jobs between the date of her termination from Towers Perrin and the date of the trial in this matter. Pl. Ex. 2.

According to Thompson's federal income tax returns for the years of 2001, 2002, 2003, and 2004, Thompson's combined gross adjusted income over the previous four years was $132,792.87, and her average annual gross adjusted income over such period was $33,198.22.[28] Pl. Ex. 4-11.

During cross-examination by counsel for NMSLGC, Thompson admitted that she had discussed the William D. Ford Income Contingent Loan Repayment Program with counsel for NMSLGC, but that she believed that it was not a viable option for her because of her advanced age. Tr. at 57-60.

Finally, in response to questioning from this Court at trial, Thompson discussed a number of mental disorders that she believes she is afflicted with. Tr. at 61-67. Thompson testified that she has been medically diagnosed as having mental depression in Minnesota and in Nevada. Tr. at 62. Thompson also testified that she currently feels that she has multiple personalities, and that although she has taken anti-depression medicine "off and on for years," and that she believed she should currently be taking anti-depression medicine. Tr. at 61-64. However, she has not taken any anti-depression medication since she ceased working. *Id.* at 63. Thompson further explained that she

---

[28] In 2001, Thompson's gross adjusted income was $47,501.69. In 2002, $19,689.29. In 2003, $33,373.89. In 2004, $32,228.00. Pl. Ex. 4-11.

believes she has multiple personalities and that they are what prevents her from staying in any one place for too long, and consequentially from holding onto any one job for more than a few years at a time.  Tr. at 64-67.

## III.

## ARGUMENTS

NMSLGC, by counsel, argues first that it retains an enforceable student loan debt obligation against the debtor, Thompson, for the student loans she borrowed to fund her education at New Mexico Tech.  In support of this proposition, NMSLGC concedes that its judgment against Thompson in New Mexico state court has both expired by its own terms on March 5, 2005, and has been voluntarily set aside on October 7, 2004 after NMEAF's claim had been paid by NMSLGC.  NMSLGC further concedes that, at first blush, New Mexico's doctrine of merger would seem to preclude collection of the debt due to the merger of the promissory note with the judgment and the subsequent expiration of the judgment.  However, NMSLGC argues that even though under New Mexico state law, judgments expire after fourteen years, ordinarily time barring collection of the debt and thereby extinguishing NMSLGC's right to collect under the judgment levied against Thompson, that nevertheless, Congress -- through 20 U.S.C. § 1091a(a) and pursuant to the Supremacy Clause of the United States Constitution -- has preempted[29] New Mexico state law in this area by eliminating any state limitations which would otherwise bar collection of her student loan debt.

---

[29]  Counsel for NMSLGC argues that §1091a(a) preempts New Mexico state law "by all manner of preemption enunciated by the Supreme Court: express, field and conflict."  See Def. Mem. of Law, May 6, 2005, p. 6.

Because Section 1091a(a) and New Mexico state law conflict, NMSLGC argues that the doctrine of merger, although generally applicable in New Mexico, would not be applied in this instance to defeat NMSLGC's right to collect under the HEA.  NMSLGC argues rather that its right to seek repayment of the loan is an independent right arising under Title 20 of the United States Code, Sections 1071 through 1087.  NMSLGC argues finally that it has fulfilled all of the necessary prerequisites to come under the protection set forth in the HEA, including entering into the requisite agreement with the Secretary of Education, reimbursing NMEAF, the previous loan holder, for the defaulted loan, and contracting with Premiere, a collection agency, to attempt collection from Thompson through wage garnishment.

Thompson, in turn, concedes that Section 1091a of the HEA eliminates the statute of limitations on NMSLGC's right to seek repayment of her student loans.  However, Thompson argues that the effective date of Section 1091a was April 9, 1991, and therefore, Section 1091a only applies to judgments obtained after April 9, 1991. Thompson argues that the judgment against her was entered on March 15, 1991, approximately three weeks prior to the effective date of the HEA amendments, and therefore, the HEA does not apply to her debt.  Because the HEA does not apply, Thompson argues, the New Mexico statute of limitations has expired, and NMSLGC, therefore, no longer has the right to continue its pursuit of collection of her student loans. Additionally, Thompson argues that because NMSLGC has had no right to pursue this debt, that the wage garnishment instituted in July, 2004 was therefore illegal.

In its rebuttal, NMSLGC argues that pursuant to Section 1091a, NMSLGC paid NMEAF's claim for Thompson's student loans and the debt, therefore, became NMSLGC's property on August 13, 1993, after the April 9, 1991 enactment date. Therefore, NMSLGC argues, the HEA would apply to Thompson's debt and therefore permit NMSLGC to continue its collection efforts indefinitely.

As to the issue of dischargeability of the student loan debt, assuming that an obligation does exist, Thompson argues that she has met the burden of proof to obtain a discharge due to "undue hardship" under Section 523(a)(8) of the United States Bankruptcy Code. In support of this proposition, Thompson argues that she meets each of the three prongs of the "*Brunner* test" for making a finding of undue hardship in this context.

First, Thompson argues that she is maintaining a minimal standard of living. She argues that she is unemployed, owns an old car, and has been in a fairly recent car accident. Even when Thompson was working, she argues that almost half of her disposable income was spent on rent alone. Second, Thompson argues that her age and poor physical condition, including high blood pressure and depression, provide sufficient additional circumstances to suggest that her current state of affairs is likely to persist for a significant portion of the repayment period. Further, Thompson argues that in order to avoid a stroke, she needs to live as "stress free" as possible. Finally, with regard to the third *Brunner* prong, Thompson argues that her past willingness to relocate all over the country in order to secure employment, combined with the fact that she has held so many

different jobs over the past eighteen years, constitutes good faith efforts on her part to secure employment in order to repay her student loans.

NMSLGC, by counsel, argues that under a *Brunner* analysis, Thompson does not meet the standard to obtain a discharge of her student loan debts.  However, in doing so, counsel for NMSLGC concedes the first two prongs of *Brunner*.  With regard to the first, NMSLGC concedes that Thompson's unemployed status, her rent receipts, and her trial testimony pertaining to her car suggests that she presently maintains a minimum standard of living.  As for the second prong, the likeliness that the condition will persist into the foreseeable future, NMSLGC concedes that it would appear that Thompson's depression caused by her difficult past, while not impacting her ability to find employment initially, does appear to impact her ability to keep a job on any permanent basis, and therefore Thompson probably also meets the second prong of *Brunner*.

It is the third prong of the *Brunner* analysis, which requires a good-faith effort on the part of the debtor to repay the loan, that NMSLGC believes Thompson cannot meet. NMSLGC argues that Thompson's initial three voluntary payments in 1988 and three semi-voluntary payments when the lawsuit was filed, with no other payments in eighteen years, do not constitute a good faith effort to repay.  Additionally, NMSLGC argues that during this same time frame, Thompson has held at least seven jobs in which she earned more than ten dollars per hour, including several in which she earned substantially more.

NMSLGC argues further that adding up Thompson's salaries at the jobs she has held over the past eighteen years reveals that Thompson has made approximately five hundred thousand dollars before taxes, for an average of nearly thirty thousand dollars per

year, every year, since she graduated from New Mexico Tech.   Moreover, NMSLGC

argues that adding up Thompson's income from the tax returns that Thompson herself

submitted into evidence from the years 2001 through 2004 reveals that Thompson earned

nearly one hundred thirty-three thousand dollars in just the past four years, or an average

of in excess of thirty-three thousand dollars per year.

Put in this context, NMSLGC argues that even though Thompson's average yearly

salary over the past eighteen years was on average, approximately twenty-nine to thirty-

two thousand dollars per year, she has only made six payments.   NMSLGC finally argues

that Thompson's apparent unwillingness to even consider the William D. Ford Income

Contingent Repayment Program provides further indicia that Thompson has not made a

good faith effort to repay her student loan debt.

## IV.

## CONCLUSIONS OF LAW

In order to determine whether Thompson's student loans are properly

dischargeable through the bankruptcy court, there are two dispositive issues that this

Court must determine.   The first issue is whether NMSLGC retains an enforceable debt

against Thompson under either state law or under the HEA?   If it does not, then the

analysis obviously ends there.   If, however, this Court does find that NMSLGC does

retain an enforceable student loan obligation against Thompson, the question then

becomes would repayment of this student loan obligation constitute an undue hardship to

Thompson.

However, as an initial matter, the Court recognizes that the first issue, pertaining to the HEA, was not raised by Thompson at trial, in her pleadings, or otherwise.  Thus,  this Court must also consider whether it is proper in this instance, for the Court to *sua sponte* decide what is effectively an affirmative defense to repayment of Thompson's student loans.  At the same time the Court must additionally consider the propriety of *sua sponte* reopening the evidence in this matter, pertaining to this additional issue.

**A.**

**May the Court *sua sponte* decide a potentially dispositive issue and in the course of doing so, reopen the evidence?**

During the April 5, 2005 Adversary Proceeding on the Plaintiff's Complaint to Determine Dischargeability of Debt, counsel for NMSLGC brought to the attention of the Court that there is some question as to whether or not NMSLGC retains an enforceable student loan obligation against Thompson.

The question of whether or not NMSLGC retains an enforceable student loan obligation against Thompson may adequately be analogized to an affirmative defense to repayment of the student loans on the part of Thompson.  Thus, the court must consider whether it is proper for the Court to consider such matters when not affirmatively alleged by Thompson, who is a *pro se* in this matter.

Section 105(a) of the Bankruptcy Code provides the basis for a bankruptcy court's broad exercise of power in the administration of a bankruptcy case under Title 11:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any

> determination necessary or appropriate to enforce or implement court orders
> or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a) (West 2005).[30]

Congress added the second sentence of section 105(a) as part of the 1986 Amendments to the Code to provide a clear statutory expression of its intent in allowing the bankruptcy court to act or to make a determination on its own volition.   132 CONG.REC. S5092 (daily ed. Oct. 3, 1986).  Senator Hatch stated that "the [amendment] allows a bankruptcy court to take any action on its own, or to make any necessary determination to prevent an abuse of process and to help expedite a case in a proper and justified manner."   *Id.* (statement of Senator Hatch); *see also Gibbons v. Haddad* (*In re Haddad*), 68 B.R. 944, 949 (Bankr. D. Mass. 1987) (positing that the addition of the second sentence in the 1986 amendments granted clear statutory authority of a bankruptcy court's power to act *sua sponte*); *U.S. v. Energy Resources Co.*, 495 U.S. 545 (1990) (bankruptcy courts have broad authority to modify creditor-debtor relationships);   *Exquisito Servs., Inc. v. U.S.* (*In re Exquisito Serv. Inc.*), 823 F.2d 151, 155 (5th Cir. 1987) (Section 105(a) is the primary source of the equitable powers of the bankruptcy court and provide the basis for a "broad exercise of power in the administration of a bankruptcy case.");   *Nat'l Labor Relations Bd. v. Brada Miller Freight Sys. Inc.* (*In re Brada Miller Freight Sys., Inc.*), 16 B.R. 1002, 1013 (N.D. Ala. 1981) (the primary purpose of Section 105(a) is to empower the bankruptcy court with the ability to act in a manner which is appropriate or necessary to

---

[30]   The citation in this Memorandum Opinion to Title 11 of the United States Code are to those sections in effect at the time of the trial, not to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which will take effect on October 17, 2005.

facilitate the exercise of its jurisdiction); *Land Bank of St. Paul v. Brown* (*In re James*), 30 B.R. 145, 150 (Bankr. E.D. Mich. 1982) (asserting that "[t]he basic intention of [§ 105(a)] is to enable the bankruptcy court to do whatever is necessary to aid its jurisdiction, i.e., anything arising in or relating to a bankruptcy case"). Bankruptcy courts have also historically been regarded as courts of equity with broad equitable powers. *In re Wellman*, 89 B.R. 880, 883 (Bankr. D. Colo. 1988) ("[t]he Bankruptcy Court has long been recognized as a court of equity."); *In re Wilnor Drilling Inc.*, 29 B.R. 727, 729-30 (S.D. Ill. 1982) (noting that "[i]t is well established that 'the courts of bankruptcy are courts of equity and exercise all equitable powers unless prohibited by the Bankruptcy [Code]' ") (citations omitted).

Finally, the Supreme Court has recognized that *pro se* complaints, in particular, are to be liberally construed by the court. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that the Supreme Court holds the *pro se* complaint to "less stringent standards than formal pleadings drafted by lawyers"); *see also Gordon v. Leeke*, 574 F.2d 1147 (4th Cir.) (*pro se* complaints are to be liberally construed, and the lay pleader is not to be held to the technical niceties of an attorney); *Holsey v. Bass*, 519 F. Supp. 395, 402-403 (D. Md. 1981) (citing *Haines* generally) (*pro se* claims are to be liberally construed).

It is clear, therefore, to the court that it is appropriate to decide this issue. Given the facts of this particular case, although the issue was not affirmatively raised by the debtor in this instance, she is entitled to have it resolved by this Court.

Additionally, in order to properly determine this new and previously unraised issue, the Court was forced to *sua sponte* reopen the evidence in this matter by its Order

dated May 13, 2005.  The Court ordered each side to prepare and submit written briefs outlining their respective positions on this newly raised issue and scheduled an evidentiary hearing for June 15, 2005.

It is within the discretion of the trial court to correct any errors or gaps in the record by hearing additional evidence.  *Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 295 (4th Cir. 1990); *O.M.I. Corp. of Am. v. Kelsh Instrument Co.*, 279 F.2d 579, 584-85 (4th Cir. 1960).  The trial court may reopen the evidence in a matter *sua sponte*.  *See M&B Printing Equip. Corp. v. Atl. Nat'l Bank* (*In re M&B Printing Equip. Corp.*), 18 B.R. 411, 412-13 (Bankr. S.D. Fla. 1981).  *See also* 60 C.J.S. Motions & Orders § 2 (1969) (a judge may act *sua sponte* when "it is in the interests of orderly procedure and to prevent confusion of the issue.").  In the present case, justice and fairness demanded that each party be permitted to submit additional evidence on the newly raised issue.

## B.

### Does NMSLGC retain a valid and legally enforceable student loan obligation from Thompson?

Having concluded it appropriate to decide this issue, the Court must next determine whether NMSLGC does, in fact, retain a valid and legally enforceable student loan obligation from Thompson.  The original lender, NMEAF, obtained a judgment against Thompson in the amount of $26,095.69, including $6,497.42 in attorney's fees and $106.00 in costs, with interest at a rate of 9% per annum from March 1, 1991 until paid.  *See* Pl. June 15, 2005 Ex. A.  The judgment, captioned CV 90 03182, was garnered

34

in the Second Judicial District Court, County of Bernalillo, State of New Mexico on March 5, 1991. *Id.*

First, the Court must determine what effect this judgment had on the underlying promissory notes evidencing Thompson's student loan debt under New Mexico state law. The doctrine of merger, which is applied by the courts of the state of New Mexico, is an "aspect of *res judicata* which prevents relitigation of existing judgments." *Kepler v. Slade*, 119 N.M. 802, 806 (1995) (quoting *Brenton State Bank v. Tiffany*, 440 N.W.2d 583, 585 (Iowa 1989). Under the doctrine of merger, the promissory notes which underlie an obligation are merged into the judgment and the obligation they document ceases to exist independently of the judgment. In short, this means that a judgment rendered on a promissory note constitutes an "obligation that is separate and distinct from the underlying note itself." *Huntington Nat'l Bank v. Sproul*, 116 N.M. 254, 257-58 (citing *Bassett v. Eagle Telecommunications, Inc.*, 750 P.2d 73, 76 (Colo. Ct. App. 1987) (upon entry of a judgment, defendant's liability under preceding claims ceases to exist and is replaced by new liability under the judgment); *Neel v. First Fed. Sav. & Loan Ass'n*, 207 Mont. 376 (1984) ("when a claim on a contract is reduced to judgment, '[t]he contract between the parties is voluntarily surrendered and canceled by merger in the judgment and ceases to exist.' ") (citation omitted); *Woodcraft Constr., Inc. v. Hamilton*, 56 Wash. App. 885 (1990) (a valid final money judgment extinguishes the underlying claim and gives rise to a new cause of action on the judgment)). Thus, because of the doctrine of merger, when the judgment against Thompson was obtained in New Mexico

state court, the promissory notes underlying Thompson's student loan debt obligation merged into the judgment to the extent the judgment continues to exist.

The Court must next turn its analysis to the current status of the judgment. Counsel for NMSLGC represented to the Court that the New Mexican state court judgment is effectively no longer in legal existence. Tr. at 78-99. First, the judgment has expired by its own terms under New Mexico's fourteen year state statute of limitations, and second, NMSLGC successfully moved to have the judgment dismissed in New Mexico state court, as well. Thus, the state court judgment has been both time-barred and voluntarily dismissed. The Court will deal with the latter of these two issues first.

The judgment was "dismissed without prejudice" on October 7, 2004 on NMEAF's "Motion to Set Aside Judgment and Dismiss Case." *See* Pl. June 15, 2005 Ex. B. Under New Mexico law, the words "without prejudice" contained in an order of dismissal indicate that the issuing court's order was final, but that the dismissal was not intended to have the effect of *res judicata* as to the merits of the controversy, so as to "preclude plaintiff from pursuing a new action once he exhausted available administrative remedies." *Bralley v. City of Albuquerque*, 102 N.M 715, 719 (1985) (a dismissal "without prejudice" leaves the parties as if no action had been instituted). "The words 'without prejudice' when used in an order or decree generally indicate that there has been no resolution of the controversy on its merits and leave the issues in litigation open to another suit as if no action had ever been brought." *Bralley*, 102 N.M at 718-19 (citing *Marquez v. Juan Tafoya Land Corp.*, 96 N.M. 503 (1981); *Meeker v. Walker*, 80 N.M. 280 (1969); Restatement (Second) Judgments § 20 (1982)). "A dismissal 'without

prejudice' gives the complainant the right to state a new and proper cause of action, if he can, and does not take away any rights of defense to the action.  The designation of the dismissal of an action 'without prejudice' is in the nature of a judgment." *Bralley*, 102 N.M. at 719 (citing *Thompson-Hayward Chem. Co. v. Cyprus Mines Corp.*, 8 Kan. App. 2d 487, 660 P.2d 973 (1983)) (recognition that a dismissal "without prejudice" does not bar a subsequent action, as there is "no decision of the controversy on its merits," leaving "the whole subject in litigation as much open to another application as though no suit had ever been brought," is a long-standing and commonly understood rule); *see also Chavez v. Chenoweth*, 89 N.M. 423, 428 (N.M. Ct. App. 1976) (holding dismissal without prejudice was not *res judicata* and that such dismissal ordinarily imports further proceedings) (citing *Fiumara v. Am. Surety Co.*, 346 Pa. 584 (1943); *Salazar v. Yellow Freight Sys., Inc.*, 109 N.M. 443 (1990); *Royal Ins. Co. v. Rousselot*, 720 S.W.2d 2 (Mo. Ct. App. 1986) (dismissal "without prejudice" in worker's compensation proceeding held not to be a determination of rights or issues on the merits, nor bar to the claimant's refiling of the same claim) (citing *Hugelman v. Beltone Kansas City Hearing Serv. Co.*, 389 S.W.2d 220, 223 (Mo. Ct. App. 1965).  Because the New Mexico state court order was dismissed "without prejudice," New Mexico state law does not bar re-prosecution of the debt on those grounds.[31]   Accordingly, it is as though the New Mexico state

---

[31]  Additionally, the Court notes that NMSLGC's voluntary dismissal of the judgment cannot be found to be a waiver of their right to further pursue collection of the student loan debt. Under New Mexico law, "waiver is the intentional relinquishment of a known right." *Marquez v. Juan Tafoya Land Corp.*, 96 N.M. 503, 505 (1981) (citing *Ed Black's Chevrolet Ctr., Inc. v. Melichar*, 81 N.M. 602 (1970) (finding no intentional relinquishment because dismissal was without prejudice).  Even if waiver had been alleged in the present situation, which it was not, there clearly has been no "intentional relinquishment" here because first, a dismissal without prejudice contemplates the right to further proceedings and second, NMSLGC continued to

proceeding was never brought, there is no effective merger, and the promissory notes evidencing Thompson's student loans have never been extinguished and remain the source of the obligation.

However, in addition to being affirmatively released, the judgment has also has expired by its own terms under the New Mexico state statute of limitations. Thus, the Court must also determine whether the expiration of New Mexico's fourteen year statute of limitations bars collection of the student loan debt against Thompson. In order to answer this question, the Court must determine whether or not Section 1091a of the HEA serves to revive what would otherwise be a time-barred debt. Before deciding this issue, however, the Court must entertain the debtor's argument as to whether Section 1091a of the HEA is even applicable in the instant matter.

In Thompson's pleading, "Response to Memorandum of Law," filed on May 27, 2005, Thompson argues that the provisions of the HEA do not apply to her or her student loan debt because, she argues, the HEA in general, and Section 1091a in particular, applies only to judgments obtained after April 9, 1991, and the judgment against her was obtained three weeks earlier, on March 15, 1991. Thompson argues that because the HEA is inapplicable to her student loan debt, the fourteen year statute of limitations in New Mexico,[32] which, admittedly by NMSLGC, expired on March 15, 2005, bars collection of her debt. Therefore, Thompson argues, NMSLGC has no right to continue

---

pursue collection of the debt through the avenues provided for under the HEA.

[32] N.M. STAT. ANN. § 37-1-2 (Michie 1978).

to pursue collection of the debt against her.  For the reasons set forth below, this Court must disagree.

In 1991, Congress amended the statute of limitations provision of the HEA through the Higher Education Technical Amendments of 1991 ("HETA") to intermittently remove the statute of limitations on student loans.  Pub. L. No. 102026, 105 Stat. 23 (1991).  Later, Congress went further and eliminated the statute of limitations on collection of student loan debts altogether, as codified in 20 U.S.C. § 1091a.[33]  Congress completed the strengthening of these recovery provisions by making the HETA amendments effective as if enacted by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").[34]   COBRA provided that, "notwithstanding any provision of state law that would set an earlier deadline for filing suit," the United States may file suit to recover on defaulted student loans for six years following the date on which the loan was assigned to the Secretary of Education.   Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, §16033, 100 Stat. 82 (1986), effective April 7, 1986.  Therefore, "as a necessary consequence of the express retroactivity clause, actions that had become time-barred after the enactment of COBRA…were revived."

---

[33] "Not withstanding any other provisions of statute, regulation, or administrative elimination, no limitation shall terminate the period within which suit may be filed, a judgment may be enforced, or an offset, garnishment, or other action initiated or taken…".  20 U.S.C. § 1091a(a)(2).

[34] *See* Kris Aungst, *Student-Loan Dischargeability: Does the Doctrine of Laches Apply?*, 23-6 Am. Bankr. Inst. J. 42, 42 n. 15 (2004) (See HETA §3(c), Pub. L. No. 102-325, §1551, 106 Stat. 448, 838 (1992).  "The amendments originally applied only to "actions pending on or after the date of enactment of [HETA] …" See Pub. L. No. 102-325, §1551, 106 Stat. 448 (1992). However, when the interim status was removed from the amendment, it became retroactively applied to the COBRA of 1985.) (footnote unaltered).

*United States v. McLauglin*, 7 F. Supp.2d 90, 91 (D. Mass. 1998) (citing *U.S. v. Phillips*, 20 F.3d 1005, 1007 (9th Cir. 1994)) (other citations omitted).

Further evidence of Congress' intent to make the limitations of §1091a applicable retroactively comes from the legislative history of the amendments.    During the Congressional debates, Representative Goodling, one of the sponsors of the 1991 Amendments explicitly addressed their retroactive application: "Some questions have arisen regarding the running of the statute of limitations.  The amendment would life [sic] the statute of limitations for all time, would apply it retroactively, and would sunset this provision on November 15, 1992 in line with the reauthorization of the Higher Education Act."[35]  137 CONG. REC. H1808 (daily ed. March 19, 1991) (statement of Rep. Goodling) (cited in *U.S. v. Glockson*, 998 F.2d 896, 897 (11th Cir. 1993); *U.S. v. Davis*, 801 F. Supp. 581, 584 (M.D. Ala. 1992)).    Additionally, another bill sponsor, Representative Ford, stated that "the bill would eliminate the statute of limitations with respect to recovery of defaulted student loans through offsets of Federal income tax refund, litigation, and garnishment, where otherwise permitted by Federal law."  137 CONG. REC. H1808 (daily ed. March 19, 1991) (statement of Rep. Ford).

The United States Supreme Court has instructed that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there. [citations omitted]  When the words of a statute are unambiguous, then, this first canon is

---

[35]  The Court notes that when the bill sponsor made these comments, he was referring specifically to IRS offsets of tax refunds.  *See* 137 CONG. REC. H1808 (daily ed. March 19, 1991) (statement of Rep. Goodling).  However, the amendments to which he was referring, as one Court has stated, "apply equally to collection by income-tax offsets and collection through litigation."  *U.S. v. Davis*, 801 F. Supp. 581, 584 (M.D. Ala. 1992).

also the last: 'judicial inquiry is complete.' " *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254-55 (1992) (quoting *Rubin v. U.S.*, 449 U.S. 424, 430 (1981)). Here, Congress has been clear: no limitation shall terminate the period within which suit may be filed to enforce a student loan obligation, regardless of when that obligation was incurred.

Courts that have considered this issue have held unequivocally that Congress intended Section 1091a to apply retroactively to all student loan collection actions. "[B]y retroactively eliminating all statutes of limitations and reviving claims previously time-barred by statutes of limitations, [citation omitted] Congress sought to erase obstacles that the government might encounter in collecting defaulted loans." *U.S. v. Davis*, 817 F. Supp. 926, 929 (M.D. Ala. 1993) (citing *U.S. v. Davis*, 801 F. Supp. at 583-84); *see also Glockson*, 998 F.2d at 897 (holding that Congress intended §1091a to "apply retroactively to all student loan collection actions."); *U.S. v. Phillips*, 20 F.3d 1005 (9th Cir. 1994) (Congress "revived all actions which would have otherwise been time-barred."); *U.S. v. Hodges*, 999 F.2d 341, 341-42 (8th Cir. 1993) (the HEA's abrogation of the six-year statute of limitations for recovery on student loan debts applies retroactively to revive the government's expired claims to recover defaulted student loans); *U.S. v. Mastrovito*, 830 F. Supp. 1281, 1282-84 (D. Ariz. 1993) ("the Higher Education Act was amended to abolish the statute of limitations with respect to the recovery of defaulted student loans"); *U.S. v. Wall*, 794 F. Supp. 350, 351-52 (finding that application of the amendments only to actions after its enactment would "create an irrational distinction between types of claims which were already time barred under the prior law, based only on the happenstance of whether an action had been filed or not . . . A more reasonable

interpretation is that Congress intended HETA to apply to any action, whether currently pending or not, so long as it is filed before the sunset date of the Higher Education Act."); *Sibley v. U.S. Dep't of Educ.*, 913 F. Supp. 1181, 1188-89 (finding that " . . . retroactive repeal of a limitations period applicable to monetary debts does not violate due process. [citation omitted]   Statutes of limitations are legislatively created defenses, not constitutionally protected 'property,' and thus are subject to legislative amendments, including retroactive appeals."); *U.S. v. Cawley*, 821 F. Supp. 1219, 1222 (E.D. Mich. 1993); *U.S. v. Robbins*, 819 F. Supp. 672, 674 (E.D. Mich. 1993); *U.S. v. Smith*, 811 F. Supp. 646, 648 (S.D. Ala. 1992).

Under a literal interpretation of the plain language of the statute and amendments, and when considering the statute's legislative history, as well as firmly settled judicial precedent, Thompson's argument, that the HEA is inapplicable to her student loan debt by way of a limitations defense, must fail.  The courts that have decided this issue have overwhelmingly mandated that the provisions of Section 1091a are to be applied retroactively.  The fact that Thompson's judgment was rendered approximately three weeks prior to the official enactment of the statute cannot provide her with an avenue to escape repayment of her loans.

Having concluded that Section 1091a of the HEA is retroactively applicable to Thompson's student loan debt, this Court must next consider whether Section 1091a revives Thompson's student loan obligation to NMSLGC, when it would otherwise be barred by the New Mexico statute of limitations.

Congress's intent through Section 1091a could not be clearer. Congress has mandated that there is no statute of limitations for student loan collection actions. "Notwithstanding any other provision of statute, regulation, or administrative limitation, no limitation shall terminate the period within which suit may be filed, a judgment may be enforced, or an offset, garnishment, or other action initiated or taken." Higher Education Technical Amendments of 1991, Pub.L. 102-26, § 3(a), 105 Stat. 123, 124 (codified at 20 U.S.C. § 1091a(a)(2)). It is clear that Congress intended that no limitation terminate the period within which an action may be filed.[36] This Court must, therefore, find that the expiration of the fourteen year New Mexico state statute of limitations does serve to bar to NMSLGC's attempted collection of Thompson's delinquent student loan debt. When "the terms of a statute [are] unambiguous, judicial inquiry is complete." *Rubin v. U.S.*, 449 U.S. 424, 430 (1981). Congress has made its intention to prevent such defenses clear and unequivocal.

Having hereby concluded that NMSLGC does retain an enforceable student loan obligation from Thompson, it is left for this Court to decide whether or not this debt may be properly discharged through the bankruptcy process.

---

[36] Furthermore, it is firmly established that such an abrogation of statutes of limitations does not violate due process. The Supreme Court has held that the repeal of a statute of limitation on personal debts does not deprive a debtor of property in violation of the Fourteenth Amendment. *Campbell v. Holt*, 115 U.S. 620 (1885). "Statutes of limitations are legislatively created defenses, not constitutionally protected 'property,' and thus are subject to legislative amendments." *Id.* at 628. *See also U.S. v. Hodges*, 999 F.2d 341, 342 (8th Cir. 1993) (the repeal of a statute of limitation on personal debts does not deprive a debtor of property in violation of constitutional due process requirements); *Sibley v. U.S. Dep't of Educ.*, 913 F.Supp. 1181, 1188-89 (N.D. Ill. 1995); *U.S. v. McLaughlin*, 7 F.Supp.2d 90, 91 (D. Ill. 1998); *U.S. v. Smith*, 862 F.Supp. 257, 261 (D. Haw. 1994); *U.S. v. Smith*, 811 F.Supp. 646, 647 (S.D. Ala. 1992).

## C.

## Would requiring Thompson to repay her student loan debt to NMSLGC constitute an undue hardship

The policy underlying the bankruptcy laws of the United States is one of providing a "fresh start" to the sincere but unfortunate debtor by way of allowing certain debts to be discharged through the debtor's bankruptcy estate.   For reasons of public policy, however, Congress has chosen to except student loans from this general rule.   Student loans generally are nondischargeable debts and pass through the bankruptcy process unaffected.   *Ekenasi v. Educ. Res. Inst.* (*In re Ekenasi*), 325 F.3d 541, 545 (4th Cir. 2003) (citing *Kielisch v. Educ. Credit Mgmt. Corp.* (*In re Kielisch*), 258 F.3d 315, 320 (4th Cir. 2001)).   Congress has provided that government-guaranteed student loans are nondischargeable in bankruptcy unless the debtor can demonstrate that the repayment of such student loans would constitute an "undue hardship."   11 U.S.C. § 523(a)(8) (2005). This exception from discharge of student loans "was enacted to prevent indebted students or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans."   *In re Kielisch*, 258 F.3d at 320 (quoting *Tennessee Student Assistance Corp. v. Hornsby* (*In re Hornsby*), 144 F.3d 433, 436-37 (6th Cir. 1998)).   Section 523(a)(8) of the Bankruptcy Code provides:

> A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt –
> (8)   for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or

stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C § 523(a)(8) (2005).

The term "undue hardship" is undefined in the Bankruptcy Code. The Fourth Circuit Court of Appeals has adopted the three-part test articulated in the decision of *Brunner v. New York State Higher Educ. Servs. Corp*., 831 F.2d 395, 396 (2d Cir. 1987). *In re Ekenasi*, 325 F.3d at 546.[37]  Thus, in order to discharge a government-guaranteed student loan, a debtor "must establish (1) that he cannot maintain a minimal standard of living for himself and his dependents, based on his current income and expenses, if he is required to repay the student loans; (2) that additional circumstances indicate that his inability to do so is likely to exist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans." *Id.* (quoting *Brunner*, 831 F.2d at 396).  The debtor must satisfy all three parts of this test before her student loans can be discharged.  Failure to prove any one of the three prongs will defeat the debtor's case entirely.  *Faish v. Pa. Higher Educ. Assistance Agency* (*In re Faish*), 72 F.3d 298, 306 (3rd Cir. 1995); *Nys v. Educ. Credit. Mgmt. Corp.* (*In re Nys*), 308 B.R.

---

[37]  Prior to *In Re Ekenasi*, a number of courts within the Fourth Circuit Court of Appeals had utilized the *Brunner* factors to analyze whether the repayment of a student loan constituted an undue hardship under Section 523(a)(8) of the Bankruptcy Code.  *See Wilson v. Educ. Credit Mgmt. Corp.* (*In re Wilson*), No. 01-30624, 2002 WL 32155401, at *3 (Bankr. E.D. Va. June 25, 2002); *see also Tennessee Student Assistance Corp. v. Mort* (*In re Mort*), 272 B.R. 181, 183 (W.D. Va. 2002); *Vermont Student Assistance Corp. v. Coulson* (*In re Coulson*), 253 B.R. 174, 177 (W.D.N.C. 2000); *Ammirati v. Nellie Mae, Inc.* (*In re Ammirati*), 187 B.R. 902, 905 (D.S.C. 1995); *Virginia Educ. Assistance Auth. v. Dillon* (*In re Dillon*), 189 B.R. 382, 384 (W.D. Va. 1995); *McCormack v. Educ. Credit Mgmt. Corp.* (*In re McCormack*), No. 99-10637, 2000 WL 33710278, at *4 (Bankr. D.S.C. July 3, 2000); *Walcott v. USA Funds, Inc.* (*In re Walcott*), 185 B.R. 721, 724 (Bankr. E.D.N.C. 1995).

436, 441 (B.A.P. 9th Cir. 2004) (citing *Saxman v. Educ. Credit Mgmt. Corp.* (*In re Saxman*), 325 F.3d 1168, 1173 (B.A.P. 9th Cir. 1999)).

A determination of the dischargeability of a student loan must be brought by filing an adversary proceeding. *Banks v. Sallie Mae Servicing Corp.* (*In re Banks*), 299 F.3d 296, 300 (4th Cir. 2002) (citing Fed. R. Bankr. P. 7001(6)). The debtor has the burden to prove by a preponderance of the evidence that repayment of the student loans would constitute an undue hardship. *U.S. Dep't of Educ. v. Blair* (*In re Blair*), 301 B.R. 181, 184 (D. Md. 2003) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)); *Jones v. Nat'l Payment Ctr.* (*In re Jones*), 242 B.R. 321, 325 (Bankr. E.D. Va. 1998), *aff'd in part and remanded on other grounds sub nom. Educ. Credit Mgmt. Corp. v. Jones*, No. 3:99CV258, 1999 WL 1211797 (E.D. Va. July 14, 1999).

Generally speaking, the legislative history of Section 523(a)(8) suggests a finding of undue hardship is an exception to the rule, and it must mean more than unpleasantness associated with repayment of a just debt. *In re Jones*, 242 B.R. at 325. Each undue hardship discharge must rest on its own facts, but dischargeability of student loans should be based on a "certainty of hopelessness." *Id.* (quoting *Lezer v. New York State Higher Educ. Servs. Corp.* (*In re Lezer*), 21 B.R. 783, 789 (Bankr. N.D.N.Y. 1982)). In order to discharge a student loan, a debtor must show that unique or extraordinary circumstances which created the hardship render it unlikely that the debtor will ever be able to honor her obligations. *Id.* (citing *Love v. U.S.* (*In re Love*), 33 B.R. 753, 754-55 (Bankr. E.D. Va. 1983)).

It remains then to assess the evidence adduced at trial to determine if Thompson has proven that repayment of the student loans owed to NMSLGC will constitute an undue hardship.

## 1.

## <u>Can Thompson Maintain a Minimal Standard of Living?</u>

The initial prong of the *Brunner* inquiry requires this Court to assess whether the debtor has proven she cannot maintain, based on current income and expenses, a minimal standard of living for herself and her dependents if forced to repay the student loans. *In re Ekenasi*, 325 F.3d at 546 (citing *Brunner*, 831 F.2d at 396). This first part of the *Brunner* test comports with the legislative policy behind 11 U.S.C. § 523(a)(8), that student loans "should not as a matter of policy be dischargeable before [the debtor] has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt." *Educ. Credit Mgmt. Corp. v. Polleys* (*In re Polleys*), 356 F.3d 1302, 1309-1310 (10th Cir. 2004) (quoting Report of the Comm'n on the Bankr. Laws of the United States, H.R. Doc. No. 93-137, Pt. II § 4-506 (1973), *reprinted in* Collier on Bankruptcy, App. Pt. 4(c) at 4-710 (15th ed. Rev. 2003)). This first *Brunner* requirement is the "minimum necessary to establish 'undue hardship.' " *Pena v. Pena* (*In re Pena*), 155 F. 3d 1108, 1113 (9th Cir. 1998) (quoting *Brunner,* 831 F. 2d at 396).

In making this assessment, a court should examine a debtor's standard of living with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents. *U.S. Dep't of Health & Human Servs. v. Smitley*

(*In re Smitley*)*,* 347 F.3d 109, 117 (4th Cir. 2003) (citing *In re Ekenasi*, 325 F.3d at 546;

*Rice v. U.S.* (*In re Rice*), 78 F.3d 1144, 1149 (6th Cir. 1996)).   In contemplation of what

constitutes a "minimal standard of living," some courts have equated poverty with such a

standard.  *McCormack v. Educ. Credit Mgmt. Corp.* (*In re McCormack*), No. 99-10637,

2000 WL 33710278, at *4 (Bankr. D.S.C. July 3, 2000) (citing *Griffin v. Eduserv* (*In re

Griffin*), 197 B.R. 144, 147 (Bankr. E.D. Okla. 1996)).   Other courts have not required

that debtors live in poverty in order to satisfy the first *Brunner* prong, instead taking into

consideration the debtor's current income and expenses in determining whether the debtor

and his or her dependents, if any, will be able to sustain a "minimal" standard of living.

*Id.* (citing *Ammirati v. Nellie Mae, Inc.* (*In re Ammirati*), 187 B.R. 902, 907 (D.S.C.

1995), *aff'd* 85 F.3d 615 (4th Cir. 1996)).   Specifically, the bankruptcy court must

determine what amount is minimally necessary to ensure that the debtor's needs for care,

including food, shelter, clothing and medical treatment, are met.   *Salinas v. United

Student Aid Funds, Inc.* (*In re Salinas*), 240 B.R. 305, 314 (Bankr. W.D. Wis. 1999)

(citing *In re Rice*, 78 F.3d at 1149).   Once that determination is made, the question is

whether the debtor has additional funds with which to make payments toward his or her

student loans.  *Id.*

A review of decisions of the jurisdictions of the Fourth Circuit indicates that

courts generally do not find an inability to maintain a minimal standard of living where a

debtor shows a surplus of income over expenses.  *Virginia State Educ. Assistance Auth. v.

Dillon*, 189 B.R. 382, 385  (W.D. Va. 1995) (where debtor testified that she could pay

$50-$75 each month on $2,000.00 student loan, there was no undue hardship); *Love v.*

*U.S.* (*In re Love*), 33 B.R. 753, 754 (Bankr. E.D. Va. 1983) (no undue hardship where debtor had $30.00 per month surplus of income over expenses to repay $9,000.00 student loan); *Virginia Educ. Loan Auth. v. Archie* (*In re Archie*), 7 B.R. 715, 718-19 (Bankr. E.D. Va. 1980) (evidence showed a net surplus of $37.13 of income over expenditures even with extraordinarily high telephone bill and clothing expenses to repay approximately $2,000.00 student loan).

In contrast, many of the decisions of the jurisdictions of the Fourth Circuit have permitted a discharge of student loans where there was a substantial deficiency of income to expenses for a debtor. *See, e.g.*, *Vermont Student Assistance Corp. v. Coulson* (*In re Coulson*), 253 B.R. 174, 178 (W.D.N.C. 2000) (first *Brunner* prong met where "debtor's expenses clearly exceed her income, even though debtor has done almost everything possible to maximize her income and minimize her expenses"); *Ammirati v. Nellie Mae, Inc.* (*In re Ammirati*), 187 B.R. 902, 907 (D.S.C. 1995) (no error where bankruptcy court "found the debtor's current income is $3,800.00 [monthly] with expenses of $4,350.00 and that, with the exception of selling his house, debtor had done everything possible to minimize expenses and maximize income"); *Wilson v. Educ. Credit Mgmt. Corp.* (*In re Wilson*), No. 01-30624, 2002 WL 32155401, at *3 (Bankr. E.D. Va. June 25, 2002) (discharge permitted where debtor had monthly expenses of $1,829.03 and income of $1,578.99); *McCormack v. Educ. Credit Mgmt. Corp.* (*In re McCormack*), No. 99-10637, 2000 WL 33710278, at *5 (Bankr. D.S.C. July 3, 2000) (partial discharge permitted where debtor's monthly expenses were $2,446.48 and income was $2,078.00); *Reilly v. United Student Aid Funds, Inc.*, 118 B.R. 38, 41 (Bankr. D. Md. 1990) (discharge

permitted where $600.00 per month deficiency of income to expenses). While it is certain that a proper analysis of whether the debtor may maintain a minimal standard of living and repay a student loan entails many considerations other than the existence or not of a deficiency of monthly income to expenses, nonetheless these decisions provide insight into the living circumstances which compel a court to find satisfaction or not of the initial *Brunner* prong.

In assessing the first *Brunner* prong under the evidence adduced here, the Court is satisfied that Thompson cannot maintain a minimal standard of living if forced to repay the full amount due on her student loan debt. Thompson has virtually no discretionary income. She is not presently employed outside of her home and in her bankruptcy schedules, she listed her monthly expenses to be $2,390.00. These scheduled expenses do not include her student loans.

The Court's examination of whether Thompson's scheduled expenses are reasonable in light of her financial situation reveals that although many of the expenses listed in Thompson's Schedule J appear to be acceptable, there certainly appears to be ample opportunity for minimization. In that regard, the Court notes that it is somewhat troubled by several of the proffered monthly expenses, such as the monthly clothing expense of $150.00, the monthly Cable/Internet expense of $75.00, the monthly recreation expense of $100.00, and the monthly contingency expense of $100.00. "A necessary living expense is one that the debtor cannot cut from the budget and still maintain a minimal standard of living." *Smith v. Educ. Credit Mgmt. Corp.* (*In re Smith*), __B.R.__, No. 05-005, 2005 WL 1322991, at *4 (B.A.P.1st Cir. Mass. June 6, 2005)

(citing *Educ. Credit Mgmt. Corp. v. Savage* (*In re Savage*), 311 B.R. 835, 841 (B.A.P. 1st Cir. 2004). The Court finds that Thompson's expenditures are higher than this Court, and most other courts would normally permit. *See, e.g.*, *In re Pincus*, 280 B.R. 303, 318 (Bankr. S.D. N.Y. 2002) (finding expenses such as $50.00 per month on newspaper and magazine expenses "excessive in light of the sacrifice expected of an individual to repay his student loan obligations"); *In re Buchanan*, 276 B.R. 744, 751-52 (Bankr. N.D. W.Va 2002) (finding expenses for home Internet service and movie rentals unreasonable in the context of § 523(a)(8)); *In re East*, 270 B.R. 485, 494 (Bankr. E.D.Cal. 2001) (observing that basic cable television was not necessary to maintain a minimal standard of living); *Commonwealth of Virginia State Education Assistance Authority v. Dillon*, 189 B.R. 382 (Bankr. W.D. Va. 1995) (finding that debtors failed to meet the first prong of the *Brunner* test where their budget included expenses such as $35.00 per month for cable television); *In re Wardlow*, 167 B.R. 148 (Bankr. W.D. Mo. 1993) (finding that plaintiffs were maintaining more than a minimal standard of living where their budget included expenses for cable television, recreation and miscellaneous expenses).

However, although many of the monthly expenses proffered by Thompson appear to be somewhat inflated, this alone is not terminal to her success under the first *Brunner* prong, as Thompson is presently unemployed, and has been since November, 2004. Additionally, NMSLGC has provided no evidence to this Court that contradicts Thompson's stated income level, or lack thereof, nor have they challenged these monthly expense figures proffered by Thompson. The Court cautions, however, that it brings up these excessive expenses to explain that were Thompson presently employed, the Court

would have more difficulty in finding that she is able to meet the first *Brunner* prong

absent explanation for this apparent excess in her stated monthly expenses.  Presently,

however, Thompson is unemployed and surviving solely off of state unemployment

assistance. [38] As that is the present situation, Thompson appears to meet the implausibility

requirements mandated by the first *Brunner* prong.

In sum, this Court finds that Thompson has successfully met her evidentiary

burden of persuasion with regard to the first *Brunner* prong.  Thompson has demonstrated

to the Court that she cannot presently maintain a minimum standard of living if forced to

repay the student loans.

**2.**

### Are There Additional Circumstances Indicating That Thompson Will be Unable to Maintain a Minimal Standard of Living During a Significant Portion of the Loan Repayment Period?

The second *Brunner* prong requires a student loan debtor to establish that

additional circumstances indicate that a debtor's inability to maintain a minimal standard

of living for herself and her dependents if required to repay the student loans is likely to

exist for a significant portion of the repayment period of the student loans.[39]  *Ekenasi v.*

---

[38]  *See* Pl. Exh. 16.  Thompson's initial unemployment compensation determination of $326.00 per month for a period of twenty-six (26) weeks from the VEC became effective as of November 14, 2004.

[39]  Some courts have utilized the following nonexhaustive list when analyzing facts under the "additional circumstances" prong of *Brunner*: (1) Serious mental or physical disability of the debtor or the debtor's dependents, which prevents employment or advancement; (2) The debtor's obligations to care for dependents; (3) Lack of, or severely limited education; (4) Poor quality of education; (5) Lack of usable or marketable job skills; (6) Underemployment; (7) Maximized income potential in the chosen educational field, and no other more lucrative job skills; (8) Limited number of years remaining in work life to allow payment of the loan; (9) Age or other factors that prevent retraining or relocation as a means for payment of the loan; (10) Lack of assets, whether or not exempt, which could be used to pay the loan; (11) Potentially increasing expenses that outweigh

*Educ. Res. Inst.* (*In re Ekenasi*), 325 F.3d 541, 546 (4th Cir. 2003) (citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987)).   *See also Murphy v. Sallie Mae* (*In re Murphy*), 305 B.R. 780, 797 (Bankr. E.D. Va. 2004).   The purpose of this requirement is to "ensure that the hardship the debtor is experiencing is actually 'undue,' as opposed to merely a temporary financial setback which, by definition, all debtors experience." *Matthews v. Sallie Mae Servicing*, 2004 WL 3234351, at *2 (Bankr. N.D. Ohio December 14, 2004) (citing *Miller v. U.S. Dep't of Educ.* (*In re Miller*), 254 B.R. 200, 204 (Bankr. N.D.Ohio 2000)).   Undue hardship is not based on a present inability to pay but rather upon a "certainty of hopelessness that future payments cannot be made." *Wilson v. Educ. Credit Mgmt. Corp.* (*In re Wilson*), No. 01-30624, 2002 WL 32155401, at *3 (Bankr. E.D. Va. June 25, 2002) (citing *Love v. U.S.* (*In re Love*), 33 B.R. 753, 755 (Bankr. E.D. Va. 1983)).   *But see Educ. Credit Mgmt. Corp. v. Polleys* (*In re Polleys*), 356 F.3d 1302, 1310 (10th Cir. 2004) (quoting Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?*, 71 Tul. L.Rev. 139, 197 (1996)) ("[c]ourts need not

---

any potential appreciation on the value of the debtor's assets and/or likely increases in the debtor's income; and (12) Lack of better financial options elsewhere. *Nys v. Educ. Credit Mgmt. Corp.* (*In re Nys*), 308 B.R. 436, 446-47 (9th Cir. B.A. P. 2004) (citations omitted).

Several courts within the Fourth Circuit have considered similar circumstances when analyzing facts under this prong of *Brunner. See Educ. Res. Inst. v. Ekenasi*, 271 B.R. 256, 262 (S.D. W.Va. 2002), *rev'd on other grounds*, 325 F.3d 541 (4th Cir. 2003) (citation omitted) (considering "illness, incapacity, and other extenuating circumstances of the debtor or the debtor's family"); *Perkins v. Pa. Higher Educ. Assistance Agency* (*In re Perkins*), 318, B.R. 300, 310 (Bankr. M.D.N.C. 2004) (examining such circumstances as "medical problems lack of usable job skills or severely limited education, or large numbers of dependents").

While all of these considerations could certainly be relevant if the facts so present themselves, this Court declines to adopt the type of framework set forth by the court in *Nys* until such time as the Fourth Circuit Court of Appeals instructs otherwise.

require a 'certainty of hopelessness.'  Instead, a realistic look must be made into debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like.  Importantly, 'courts should base their estimation of a debtor's prospects on specific articulable facts, not unfounded optimism,' and the inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan.").  The second prong of the *Brunner* analysis "properly recognizes that a student loan is 'viewed as a mortgage on the debtor's future'."  *In re Polleys*, 356 F.3d at 1310 (quoting Report of the Comm'n, H.R. Doc. No. 93-137, Pt. II § 4-506, *reprinted in* Collier, App. Pt. 4(c) at 4-710).

This Court's determination of the second *Brunner* prong presents a close question in Thompson's case.  Thompson appears to be unwilling or unable to maintain residence in any particular area for any significant period of time, or to maintain gainful employment on any sort of a permanent basis.  Thompson is fifty-five years old, has been unemployed for approximately the past eight months, and has frequently changed employment.  Since leaving New Orleans as a teenager, Thompson has lived in at least ten different states and has worked in at least sixteen different cities.  Since graduating from New Mexico Tech approximately eighteen years ago, Thompson has held some twenty-five jobs, or put another way, an average of approximately one new job every eight months for the better part of two decades.  The only constant in her life appears to be inconsistency – Thompson's history suggests that she either incapable of or chooses not to remain in any one area or any one job for any appreciable time period.

Moreover, Thompson's employment history over the past eighteen years is littered with racial discrimination complaints, sexual abuse accusations, terminations and resignations, arguments with fellow employees and supervisors alike, failures to show up at work on time, admonishments for leaving work early, and an overall general inability to function properly or even adequately in a working environment for a sustained period of time. This is a persistent pattern that has maintained proven itself time and again for most of Thompson's adult life.

Furthermore, Thompson testified extensively about the hardships present in her life as a result of her estranged family and their way of life, her past medical problems, and her self-diagnosed multiple personality disorder. Thompson has established a long-lasting history of running from her family, from jobs, and even from places. This pattern too has continued virtually unabated for the better part of two decades.

This prong presents a difficult question for the Court, however, because although the record is objectively clear that Thompson seems incapable of permanent sustained lucrative employment, it is equally clear that she is in fact capable of periodic lucrative employment. The record reflects that notwithstanding her issues, whatever they are, Thompson has held at least four jobs in which she earned in excess of twenty dollars per hour and another seven jobs in which she earned in excess of ten dollars per hour since graduating from New Mexico Tech and obligating herself to these student loans. Pl. Ex. 1. Conversely, Thompson's current stint of sustained unemployment is apparently at least the third time she has been unemployed for at least six consecutive months and at least the tenth time overall that she has been unemployed since graduating from New Mexico

Tech. *Id.* The Court finds that whatever the pattern is, there is no reason to believe that Thompson's remarkable instability will not replicate itself.[40]

It appears to the Court that Thompson's ability to function in a working environment for a sustained period of time, has little, if any, chance of improving in the foreseeable future and will most likely continue to impair her ability to keep employment on a permanent basis for the remainder of the life of the loan, and perhaps for the remainder of her life.   This Court is satisfied that while Thompson is not entirely unemployable, given the foregoing considerations, Thompson's current state is very likely to persist for the remainder of the loan repayment period.

In sum, this Court finds that Thompson has also successfully met her evidentiary burden of persuasion with regard to the second *Brunner* prong.   Thompson has demonstrated to the Court that there are sufficient additional circumstances present that indicate that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans.[41]

---

[40]  The record reflects that Thompson has been lucratively employed at a variety of employment positions for approximately one-half of the time since her graduation from New Mexico Tech in 1987.  This record presents a substantial dilemma to the Court in analyzing the first and second *Brunner* prongs in the context of a debtor who is well-employed, but for only one-half of the time.  As aforedescribed, the Court has concluded that Thompson satisfies the first *Brunner* prong as she was and continues to be unemployed, and generating no earned income shortly after the filing of her Complaint through at least June 15, 2005.  The second prong requiring continuation of the undue hardship is more problematic, but this Court has stated its belief that Thompson's history of lucrative employment followed by consistent periods of unemployment appears likely to continue indefinitely.  Where, as here, a debtor is well able to pay her student loans much of the time, but is, for whatever reasons, unable to maintain such employment permanently, the third *Brunner* prong of good faith efforts to repay provides the most logical and appropriate framework to address Thompson's unusual pattern of lucrative employment approximately half the time followed by periods of unemployment and underemployment.

[41]  The Court finds NMSLGC's concession during closing argument that Thompson probably does meet the requirements of the first two prongs of *Brunner* to be additionally

**3.**

### Has Thompson Demonstrated a Good Faith Effort To Repay?

While Thompson has satisfactorily met the first two *Brunner* prongs, the third prong presents the most difficult question for the Court.   The third prong of the *Brunner* test requires a court to measure whether a debtor has made a good faith effort to repay the outstanding student loans.   This final factor recognizes that "[w]ith the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 779 (7th Cir. 2002) (quoting *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993)).   This encompasses the notion that a "debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Elebrashy v. Student Loan Corp.* (*In re Elebrashy*), 189 B.R. 922, 928 (Bankr. N.D. Ohio 1995) (quoting *In re Roberson*, 999 F.2d at 1136).

In determining whether a debtor has made a good faith effort to repay a student loan obligation, a primary consideration is whether the debtor actually made any payments on the obligation, and if so, the total amount of payments. *Hall v. U.S. Dep't of Educ.* (*In re Hall*), 293 B.R. 731, 737 (Bankr. N.D. Ohio 2002) (citing *Green v. Sallie Mae Servicing Corp.* (*In re Green*), 238 B.R. 727, 736 (Bankr. N.D. Ohio 1999)).   Some

---

persuasive.  Counsel for NMSLGC stated at trial, "…I believe that perhaps even the first two prongs of the Brunner analysis have been met.  I don't know that Ms. -- It seems like Ms. Thompson's depression, it seems like from the testimony that her depression does not keep her from getting work, finding work.  I think as the Court indicated, it may have an impact on her ability to keep a job."  Tr. at 98.

courts have concluded, however, that a debtor who fails to make payments on a student

loan is not necessarily foreclosed from a finding of a good faith effort to repay, reasoning

that good faith encompasses all relevant factors. *Id.* Where a debtor has made no

payments on a student loan obligation, courts nonetheless have not precluded a finding of

good faith where the debtor has no funds to make any repayments. *In re Elebrashy*, 189

B.R. at 928 (citing *Hawkins v. Buena Vista College* (*In re Hawkins*), 187 B.R. 294, 299

(Bankr. N.D. Iowa 1995); *Conner v. Illinois State Scholarship Comm'n* (*In re Conner*),

89 B.R. 744, 749 n.18 (Bankr. N.D. Ill. 1989); *Courtney v. Gainer Bank* (*In re Courtney*),

79 B.R. 1004, 1011 (Bankr. N.D. Ind. 1987)).

One court has suggested a compendium of considerations in determining whether a

debtor has made a good faith effort to repay a student loan:

> (1) whether a debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;
>
> (2) whether the debtor has realistically used all their [sic] available financial resources to pay the debt;
>
> (3) whether the debtor is using their best efforts to maximize their [sic] financial potential;
>
> (4) the length of time after the student loan first becomes due that the debtor seeks to discharge the debt;
>
> (5) the percentage of the student loan debt in relation to the debtor's total indebtedness;
>
> (6) whether the debtor obtained any tangible benefit(s) from their student loan obligation.[42]

---

[42] This Court disagrees that the tangible benefit a debtor obtained from a student loan obligation is properly a factor in the consideration of good faith. It is not appropriate for this Court to consider the "value" of a debtor's chosen education but rather only to assess whether the three prongs of *Brunner* have been satisfied. *See In re Brunner*, 46 B.R. 752, 755 (S.D.N.Y. 1985); *Raymond v. Northwest Educ. Loan Assoc.* (*In re Raymond*), 169 B.R. 67, 71 (Bankr. W.D. Wash. 1994) ("The government is not an insurer of the value of education."); *Silliman v. Nebraska Higher Educ. Loan Program* (*In re Silliman*), 144 B.R. 748, 752 (Bankr. N.D. Ohio

*In re Hall*, 293 B.R. at 737 (citing *Flores v. U.S. Dep't of Educ.* (*In re Flores*), 282 B.R. 847, 856 (Bankr. N.D. Ohio 2002)); *see also Cheesman v. Tennessee Student Assistance Corp.* (*In re Cheesman*), 25 F.3d 356, 360 (6th Cir. 1994) (relevant good faith factors are: (1) whether the debtor attempts to repay the debt; (2) the length of time after the student loan becomes due that the debtor seeks to discharge the debt; (3) the percentage of the student loan debt in relation to the debtor's total indebtedness; and (4) the debtor's attempts to find suitable employment).

This Court has noted that a good faith effort also requires "the debtor to have made payments when he or she was in a position to make such payments," and that "[c]ourts have usually refused to discharge student loans where they are the bulk of debtor's debt or when student debt is the first or second largest single type of debt." *Wilson v. Educ. Credit Mgmt. Corp. v. Wilson* (*In re Wilson*), No. 01-30624, 2002 WL 32155401, at *4 (Bankr. E.D. Va. June 25, 2002) (quoting *Lohr v. Sallie Mae* (*In re Lohr*), 252 B.R. 84, 89 (Bankr. E.D. Va. 2000)).  Some courts have additionally looked to whether a student loan debtor has attempted to negotiate a repayment plan such as the federal government's

---

1992).

Income Contingent Repayment Plan as an important indicia of good faith.[43]  *See Cota v.*

*U.S. Dep't of Educ.* (*In re Cota*), 298 B.R. 408, 420 (Bankr. D. Ariz. 2003) ("The court

agrees that the good faith requirement of *Brunner* requires that the court consider [the

debtor's] conduct in failing to explore alternatives, such as the ICR.  However, the failure

to explore such programs, especially if the programs offer no effective relief, is not *per se*

an indication of lack of good faith."); *see also Pennsylvania Higher Educ. Assistance*

*Agency v. Birrane* (*In re Birrane*), 287 B.R. 490, 500 (B.A.P. 9th Cir. 2002) (quoting *U.S.*

*Dep't of Educ. v. Wallace* (*In re Wallace*), 259 B.R. 170, 185 (C.D. Cal. 2000) ("Good

faith is also measured by a debtor's effort—or lack thereof—to negotiate a repayment

plan.")).  Even after filing of an adversary to discharge a student loan, "[a] debtor's

obligation to make 'good faith' efforts to repay [her] education loans is not extinguished,"

and where a debtor first learns about the Income Contingent Repayment Programs during

the trial of the adversary, a court considers whether any discussions concerning such

options takes place.  *In re Wallace*, 259 B.R. at 185.  Finally, this Court is reminded that

the William D. Ford Program ("the Ford Program") is "no silver bullet," and if the

---

[43]  The United States Department of Education offers a number of repayment options for
student loans.  These plans are the standard repayment plan, extended repayment plan, graduated
repayment plan, and income contingent repayment plan, each of which is offered under the
William D. Ford Federal Direct Loan Program provided for under 34 C.F.R. § 685.208 (2005).
Under the Income Contingent Repayment program, the annual amount payable by a borrower is
the lesser of: (a) the amount the borrower would repay annually over 12 years; or (b) 20% of
discretionary income.  The Department of Education maintains an interactive website which
permits borrowers to determine what their payments would be based on the outstanding amount
due on a loan and based on the debtor's gross income and family size.  The Department of
Education also makes available on its website, the "Direct Loan Payment Handbook," which
provides worksheets which purportedly make it possible for a student loan obligor to determine
what his or her payment would be under the four types of programs.  *In re Cota*, 298 B.R. at 414
n.7, 420-21.

creditors fail to advise particular debtors of that or comparable programs and assist the debtors with pursuing them, failure to consider these alternatives does not indicate a lack of good faith. *In re Cota*, 298 B.R. at 421 (quoting *Cheney v. Educ. Credit Mgmt. Corp.* (*In re Cheney*), 280 B.R. 648, 666 (N.D. Iowa 2002)).

A review of recent decisions of the courts of the Fourth Circuit reveals that in most instances where a court determined a debtor made a good faith effort to repay their student loan there was a finding that substantial loan payments had been made. *See, e.g.*, *Floyd v. Educ. Credit Mgmt. Corp.*, 54 Fed. Appx. 124, 126 (4th Cir. 2002) (unpublished) (where bankruptcy court found the debtor kept in frequent contact with his lenders, arranged for deferrals and forbearance, investigated loan consolidations and workout options and made partial payments for a year, third prong of *Brunner* was satisfied and no error committed); *Vermont Student Assistance Corp. v. Coulson* (*In re Coulson*), 253 B.R. 174, 179 (W.D.N.C. 2000) (good faith found "where debtor has diligently made payments or sought deferments for seven years," notwithstanding "supporting at least 2 (and initially 4) dependent children by herself"); *In re Wilson*, 2002 WL 32155401, at *4 (debtor consistently made payments on student loans for twelve years and, after loan consolidation, made 29 payments); *McCormack v. Educ. Credit Mgmt. Corp.* (*In re McCormack*), No. 99-10637, 2000 WL 33710278, at *6 (Bankr. D.S.C. July 3, 2000) ("Debtor has made over twenty payments on her student loan prior to filing bankruptcy, and she has made various efforts to find a job that would provide more income, but has been unable to find one at the present time."); *In re Lohr*, 252 B.R. at 89 ("[T]he debtor made payments when she was financially able, tried to negotiate deferments and

forbearance in lieu of bankruptcy when she was not and filed bankruptcy only as a last resort.").

Conversely, where no payments at all have been made by a debtor, courts often have concluded no good faith effort to repay was in evidence. *Tennessee Student Assistance Corp. v. Mort* (*In re Mort*), 272 B.R. 181, 185 (W.D. Va. 2002) ("Although her failure to make payments on the loan does not on its own show lack of good faith, the debtor's refusal to minimize her expenses and maximize her income . . . preclude a hardship discharge of any portion of the loan."); *Weir v. Paige* (*In re Weir*), 296 B.R. 710, 718 (Bankr. E.D. Va. 2002) (no good faith shown where "[n]ot only has debtor not made any effort to repay any portion of these loans, but she has repeatedly refused various repayment options that have been offered to her"); *Kapinos v. Graduate Loan Ctr.* (*In re Kapinos*), 253 B.R. 709, 714 (Bankr. W.D. Va. 2000) (no "'good faith efforts to repay the loans' when [the debtor] has affirmatively established that she made no efforts to make any payments before seeking their discharge"). *But see Reilly v. United Student Aid Funds, Inc.*, 118 B.R. 38, 41 (Bankr. D. Md. 1990) ("[T]he debtor's demonstrated inability to tender payments on a student loan which became due five years prior to filing of bankruptcy provides an exception to the rule that payments must be made in order to show good faith.").

Decisions outside of the jurisdiction of the Fourth Circuit Court of Appeals mirror this same reluctance to find good faith where the debtor has made minimal or no payments on student loans. *See, e.g., Fuller v. U.S. Dep't of Educ.* (*In re Fuller*), 296 B.R. 813, 818 (Bankr. N.D. Cal. 2003) (no good faith shown where debtor made no

payments on his Department of Education loans); *Thomas v. Educ. Credit Mgmt. Corp.*

(*In re Thomas*), 257 B.R. 144, 150 (Bankr. S.D. N.Y. 2001) (good faith not shown where

the "[d]ebtor only made seven payments totaling $683.69 from 1991 to 1993 and has

made no payments at all since receiving her master's degree"); *Ledbetter v. U.S. Dep't of*

*Educ.* (*In re Ledbetter*), 254 B.R. 714, 717 (Bankr. S.D. Ohio 2000) (good faith not

shown "when debtor made only three payments on two student loans that represented the

only scheduled debt in [the] case"); *Douglass v. Great Lakes Higher Educ. Servicing*

*Corp.* (*In re Douglass*), 237 B.R. 652, 656-57 (Bankr. N.D. Ohio 1999) (good faith effort

to repay not shown where debtor made no payments on loans that represented 92% of her

indebtedness); *Mitchell v. U.S. Dep't of Educ.* (*In re Mitchell*), 210 B.R. 105, 109 (Bankr.

N.D. Ohio 1996) (good faith effort to repay not shown when debtor only made $300.00

payment on $8,000.00 student loan debt that was only scheduled debt in the case); *Cobb*

*v. Univ. of Toledo* (*In re Cobb*), 188 B.R. 22, 24 (Bankr. N.D. Ohio 1995) (good faith not

shown where debtor made only two payments on student loans representing over 50% of

scheduled debt); *Garrett v. New Hampshire Higher Educ. Assistance Found.* (*In re*

*Garrett*), 180 B.R. 358, 364 (Bankr. D.N.H. 1995) (good faith not shown where "[t]he

record is devoid of any payment made by [the debtor] on these loans or even any attempt

to enter into a repayment schedule with [the lenders]"); *Daugherty v. First Tennessee*

*Bank* (*In re Daugherty*), 175 B.R. 953, 958-60 (Bankr. E.D. Tenn. 1994) (good faith

effort to repay not shown where debtor made only two payments on student loans

amounting to 47% of total unsecured debt); *Raymond v. Northwest Educ. Loan Ass'n* (*In*

*re Raymond*), 169 B.R. 67, 70 (Bankr. W.D. Wash. 1994) (good faith not shown where

the debtor made no payments on his student loans for at least half the time he was employed); *Silliman v. Nebraska Higher Educ. Loan Program* (*In re Silliman*), 144 B.R. 748, 751 (Bankr. N.D. Ohio 1992) (good faith not shown where "[d]ebtor deferred the loan repayment once, but made no payments or even contacted the creditor in an attempt to reschedule the payments"). *But see Elebrashy v. Student Loan Corp.* (*In re Elebrashy*), 189 B.R. 922, 929 (Bankr. N.D. Ohio 1995) ("Given the magnitude of the student loan debt, the paucity of [the debtor's] income, and the apparent hopelessness for future improvement of his situation, the fact he made no payments on his student loans until after he had consulted an experienced bankruptcy attorney is not an indication of bad faith.").

Thompson has not convinced the Court that she has made a good faith effort to make payments on her student loans either previously to NMEAF, or now to NMSLGC. Rather, the weight of the evidence that has been presented to this Court reveals what can only be described as a prolonged pattern of ignoring her student loan creditors and obligations. The evidence before the Court of bad faith in this regard is substantial.

First, Thompson's payment record, or lack thereof, does not indicate a good faith effort to pay. By her own admission, Thompson has made virtually no payments on her student loans in nearly eighteen years. Thompson at most has made three voluntary payments on her student loans in about 1988, and what can be described at best as three semi-voluntary payments in about 1992. Tr. at 29, 97. The latter of these payments occurred only upon the lawsuit being filed against her in New Mexico state court. *Id.* Other than when she was involuntarily garnished for four months in 2004, over the past

eighteen years, these six payments mark the total of Thompson's repayment of her student loan obligations. This lack of payments over such a substantial period of time smacks of bad faith. *See Pace v. Educ. Credit Mgmt Corp.* (*In re Pace*), 288 B.R. 788, 793 (Bankr. S.D. Ohio 2003) (court found that student loan debtor who made only ten payments on her student loan debt since 1998 did not make a good faith effort to repay).

This absence of payments is despite what by any reasonable measure appears to have been substantial monthly income available over the past eighteen years to make payments on these loans. Thompson's own compilation of her previous jobs, presented as Plaintiff's Exhibit 1, suggests that she has held at least four jobs in which she earned in excess of twenty dollars per hour and at least seven additional jobs in which she earned in excess of ten dollars per hour.[44] *See* Pl. Ex. 1. Further, Thompson's income tax returns for the years 2001 through 2004 reflect annual adjusted gross incomes of $47,501.69, $19,689.00, $33,373.00, and $32,228.00. See Pl. Ex. 4, 6, 8, 10. This Court has noted that a good faith effort requires "the debtor to have made payments when he or she was in a position to make such payments." *Wilson v. Educ. Credit Mgmt. Corp. v. Wilson* (*In re Wilson*), No. 01-30624, 2002 WL 32155401, at *4 (Bankr. E.D. Va. June 25, 2002) (quoting *Lohr v. Sallie Mae* (*In re Lohr*), 252 B.R. 84, 89 (Bankr. E.D. Va. 2000)).

---

[44] The Court notes, additionally, that during counsel for NMSLGC's cross-examination, Thompson attempted to discount the accuracy of her own Exhibit 1 to the extent that some of her salaries, she stated, were not completely accurate, in that at times, she received raises throughout her term of employment and that her Exhibit only reflects her finishing salary. The Court notes first that even for a *pro se* litigant, it is rather irregular for a party to place a document into evidence that they have prepared specifically for the litigation, and then undermine the accuracy of the document while on the stand. Suffice it to say, even if any of the errors in Exhibit 1 claimed by Thompson are true, nevertheless, she still made a substantial amount of money over the past eighteen years, while at the same time refusing to repay her student loan debt.

Additionally, the record indicates that at the time her wages at Towers Perrin began being garnished, Thompson's take home pay, after <u>all</u> deductions, was approximately $990.35 per two-week period. From that, her take-home pay was garnished by ten percent, or between $144.32 and $163.63 each pay period. *See* Pl. Ex. 12(l)-(s). Thus, even with the garnishment and after all deductions, Thompson was earning, at a minimum, approximately $830.73 per two-week pay period. Thompson even made as much as $1,358.65, $1,184.76, and $1,338.81 after all deductions in three two-week pay periods in which she worked overtime. *See* Pl. Ex. 12(r)-(t). All told, Thompson had eight paychecks garnished over a period of four months for a grand total of $1,244.16.

During these last few months of Thompson's employment with Towers Perrin, she took home a total net pay of approximately $9,500.37 after deductions for federal and state taxes, 401K, GULP, and her student loan garnishment of $1,244.16. Pl. Ex. 12(l)-(v). The United States poverty guidelines, accepted into evidence as Defense April 5, 2005 Exhibit F, reflect that the poverty guideline for a one person household during the year 2005 is $9,570.00 per year.[45] This Court finds it remarkable that even including the wage garnishment, in just over four months, Thompson earned approximately the same amount of money as the government's defined poverty level for an entire year.

While courts have held that there is no requirement that a debtor be forced to live at or below the poverty level in order to successfully discharge her student loans, the fact

---

[45] The poverty guidelines are updated periodically in the Federal Register by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2).

that Thompson was living significantly above the federally defined poverty level -- as much as three to four times above -- even with the garnishment, weighs heavily against her in a finding of good faith.  Thompson left Towers Perrin in November, 2004.  At that time, her gross year to date pay was already $38,186.85 before deductions.

Thompson sought a hardship discharge only after her wages began being involuntarily garnished.  According to Thompson's paycheck stubs from Towers Perrin, submitted to this court as Plaintiff's Exhibit 12, Thompson's wage garnishment began during the July 1 to July 15, 2004 Towers Perrin pay period.  Thompson requested this Court to reopen her bankruptcy case for the sole purpose of discharging her student loan debt on July 30, 2004, a mere two weeks after the involuntary garnishment was commenced.  Thus, after eighteen years of ignoring her student loan debt, immediately as soon as Premiere, on behalf of NMSLGC, began involuntarily garnishing her wages, Thompson instantly commenced procedures to halt the garnishment, despite the fact that her take-home pay at the time was approximately two thousand dollars per month.

Thompson never attempted to get any deferments or forbearances of her loans at anytime over past eighteen years, choosing rather to ignore her student loans, and then once the garnishment began, attempt to discharge them completely.   This is a strong indicator of bad faith.  *See Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 397 (2d Cir. 1987) (finding that the debtor lacked good faith in attempting to discharge debt because she had failed to seek a deferment of her loan); *U.S. Dep't of Educ. v. Wallace* (*In re Wallace*) 259 B.R. 170, 185 (Bankr. C.D. Cal. 2000) (the debtor's "lack of diligence in pursuing repayment options, despite its repeated overtures, militates

strongly against a finding that [the debtor] continued his good faith efforts to repay the loans."); *Sands v. United Student Aid Funds, Inc.* (*Matter of Sands*), 166 B.R. 299, 311 (Bankr. W.D. Mich. 1994) ("[i]n determining the Debtor's good faith, the court must not only examine the Debtor's payments towards his student loans, but also his efforts to negotiate deferments with the applicable student loan agency."); *Healey v. Mass. Higher Educ.* (*In re Healey*) 161 B.R. 389, 397 (Bankr. E.D. Mich. 1993) (finding the debtor's attempt to discharge debt without first seeking to negotiate a payment arrangement with the lender evinced bad faith); *see also Shankwiler v. Nat'l Student Loan Marketing* (*In re Shankwiler*), 208 B.R. 701, 708 (Bankr. C.D. Cal. 1997) (court found good faith because debtor requested a forbearance for six years and minimized expenses); *McMullin v. U.S. Dep't of Educ.* (*In re McMullin*), 316 B.R. 70, 79 (Bankr. E.D. Louis. 2004) ("debtor's requests for a deferment or forbearance constitutes another indication of the debtor's good faith").  Rather than finding alternative means to avoid default, by way forbearances, deferments, and the like, Thompson simply chose to ignore her obligations, avoid her student loan creditor, and when this creditor finally initiated involuntary garnishment proceedings, only then did she seek a discharge through this Court.

The record reflects that in the eighteen years since incurring her student loan debt, Thompson has moved dozens of times.  However, there has been no evidence presented to the Court that she ever once attempted to contact her student loan holder and inform them of the change in her living situation.  Rather, Thompson appears to have made a pattern of evading her student loan obligors, moving from town to town, and state to state.  Thompson's trial testimony reflects this assumption further, as she made comments such

as, "[t]hat's where the New Mexico loan company *found me* again, in Carson City, because they served me some papers when I was in Carson City to appear at court in New Mexico" Tr. at 28 (emphasis added). In a recently issued opinion, this Court found that while not necessarily a *per se* indicator of bad faith on its own, sporadic, or in this case nonexistent, contact from the debtor to their student loan creditor does provide some indicia of the debtor's bad faith. *Gill v. Nelnet Loan Servs., Inc.* (*In re Gill*), Case No. 04-74963, Adv. Proc. No. 04-7155 (Issued June 21, 2005).

Thompson's candid admissions in this proceeding further betray her absence of any plausible explanation for her failure to make any substantial repayment of her student loans, even when she was well-employed. When the Court asked Thompson, on the stand, why she did not repay anything towards her student loans during the various times over the past eighteen years when she had relatively high paying jobs, Thompson repeatedly answered that she has "no excuse" for her failure to pay. Tr. at 74-76. Thompson also offered this same explanation in her initial complaint: "I can offer no excuse for not attempting to re-pay my student loans." Pl. Compl., p. 4. Thompson testified further that she "didn't even think of paying, didn't even think of the loan." Tr. at 75.

Finally, Thompson does not appear to have given any serious consideration to the options for entry into any of the repayment options under the William D. Ford Program. As touched upon previously, the income contingent repayment program "provides the student-loan debtor an equitable way to pay a debt that would otherwise be or later become unmanageable." *Swinney v. Academic Fin. Servs.* (*In re Swinney*), 266 B.R. 800,

806 (Bankr. N.D. Ohio 2001).   The Ford Program is offered by the United States Department of Education,[46] and allows the borrower to consolidate their student loans, while retaining eligibility for deferments and forbearances.   This loan comes directly from the federal government, rather than a private lender.   Under the Ford Program, the borrower may pay off the consolidated loan over a period of up to twenty-five years through a variety of repayment options, including those based on household income, circumstance, and size of family.   Included among these repayment options, the borrower may choose the income contingent repayment plan, in which case, repayment is based upon income, family size, loan amount, and interest rate.   Additionally, the borrower would have the option of reducing or halting their monthly payments altogether, based on extraordinary circumstances which necessitate the use of additional income to pay other expenses or if the borrower becomes economically unable to pay during a period of time. If the borrower has not repaid the loan after twenty-five years, the remainder of the loan is forgiven.

Further, even if the Ford Program does not provide a viable alternative in a particular case, the availability and viability of these repayment options should be considered as a potential alternative before attempting to discharge.   *See Tirch v. Penn. Higher Educ. Assistance Agency* (*In re Tirch*), __ F.3d __, No. 04-3125, 2005 WL 1311020, at *5 (6th Cir. June 3, 2005); *see also Cota v. U.S. Dep't of Educ.* (*In re Cota*), 298 B.R. 408, 420 (Bankr. D. Ariz. 2003).   While failure to consider such an alternative is

---

[46] *See generally*, CFR, Title 34, Part 685, etc.; U.S. Department of Education, Information for Financial Aid Professionals (IFAP) Library, www.ifap.ed.gov; and U.S. Department of Education, William D. Ford Federal Direct Loan Program, www. ed.gov/programs/wdffdl/index.html.

not a *per se* indicator of bad faith on its own, it must be considered in conjunction with everything else and weighs against a possible finding of dischargeability. *See Richie v. Northwest Educ. Loan Assn.* (*In re Richie*), 254 B.R. 913, 923 (Bankr. D. Idaho 2000) (ability to pay under income contingent repayment program may render a student loan obligation nondischargeable).

It does not appear that Thompson ever gave any serious consideration to the Ford Program.   When counsel for NMSLGC cross-examined Thompson about the Ford Program, Thompson admitted that she had been made aware of the Ford Program by the creditor, but chose not to pursue it or to look into it any further due to her advanced age. Tr. at 57-60.  Thompson was, admittedly by her, informed of and even urged to consider this program but disregarded this potential alternative repayment plan and chose rather to pursue discharge as her sole recourse.   When a debtor is supplied with notice and information of a potentially viable student loan repayment option, the debtor's failure to look into or otherwise consider this option may amount to a finding of bad faith.  *See Douglass v. Great Lakes Higher Educ. Servicing Corp.* (*In re Douglass*), 237 B.R. 652, 657 (Bankr. N.D. Ohio 1999) (failure to accept an offer from the government's income contingent repayment program may be "tantamount to an abuse of the bankruptcy process"); *In re Tirch*, 2005 WL 1311020, at *5 (debtor's decision to not take advantage of the Income Contingent Repayment plan, "while not a per se indication of a lack of good faith . . . is probative of her intent to repay her loans"); *see also Carlson v. UNIPAC Student Loan* (*In re Carlson*), 273 B.R. 481, 486 (Bankr. D. S.C. 2001) (court did not find bad faith on behalf of the student loan debtor who did not consider an Income Contingent

Repayment Program in part because "there [was] no proof that Debtor was advised of such option in time for her to properly respond to it or consider it as an option."); *McMullin v. U.S. Dep't of Educ.* (*In re McMullin*), 316 B.R. 70, 79 (Bankr. E.D. Louis. 2004) (where no evidence was presented that the debtor was actually informed of repayment options, the debtor's failure to actively seek out alternative payment plans did not bar a finding of good faith).   At a minimum, Thompson's lack of consideration of what very well could have been a viable alternative repayment program is indicia of bad faith on the part of the debtor. *See In re Tirch*, 2005 WL 1311020, at *6 ("[b]ecause [the debtor] declined to take advantage of an [income contingent repayment program] that would have been advantageous, she failed to sustain the heavy burden of proving that she made a good faith effort to repay her loans.").[47]

---

[47]   Thompson's stated objection to her consideration of the Ford Program because of her age requires some limited comment.  On the one hand, Thompson is fifty-five years old and if she were to enter into the Ford Program, her repayment period could extend for up to twenty-five years, or until she is approximately eighty years old, likely far beyond her realistic working years.  On the other hand, this program is sensitive to changes in circumstance, including income, and monthly payments may be reduced accordingly.  For example, according to the U.S. Department of Education's Income Contingent Repayment Calculator, which has been made available online by the U.S. Department of Education at www.ed.gov/offices/OSFAP/DirectLoan/RepayCalc/dlentry2.html, a student loan debt of $40,000.00 at the current student loan consolidated interest rate of 3.37% for an unmarried borrower in a household of one with a gross adjusted income of $33,197.92 (which represents Thompson's average annual income over the past four years, as reflected in her tax returns for the years 2001 through 2004, submitted into evidence as Plaintiff's Exhibits 4, 6, 8, and 10), and living in the continental United States, would require an estimated initial monthly payment of $298.77 for 65 months.  In order to formulate a better understanding of the possible range that repayment plans may fall in, the same calculations but with a lowered gross adjusted income of $10,000.00 would lower the required monthly payment to $11.50 per month for 300 months. The Court finds it compelling that according the to Department of Education's Income Contingent Repayment Calculator, that at the income that Thompson has averaged since 2001, she could make payments of less than $300 dollars per month for a mere five and a half years and she would successfully repay her student loan debt in its entirety.

While there is compelling reason to find against the debtor in the good faith third prong of *Brunner*, some consideration need also be given to Thompson's seemingly fragile mental and emotional state, and its possible impact on her ability to even make a good faith effort to repay her student loan debt.   In essence, the Court must determine whether, in spite of the aforementioned considerations that weigh strongly against a finding of any good faith on behalf of the debtor, does Thompson's mental and emotional state provide satisfactory explanation for her severe lack of good faith in repaying her student loans over the past eighteen years.

The Court has detailed many of the particulars of Thompson's life that seem to display the emotional problems she claims to have battled with for so long.   Moreover, it is not lost on the Court that these same conditions which have kept her in a seemingly fragile emotional state, have also probably either directly or indirectly been responsible for her remaining perennially in relocation throughout the nation.   Thompson has had a difficult life without question.

That said, however, it is a concern for the Court that the record is devoid of any substantive evidence that Thompson currently receives treatment for depression. Thompson presented no collaboratnig evidence that she has ever even been diagnosed as having an actual mental disorder by a medical professional.   Thompson presented no medical testimony, medical documentation, or any other form of medical evidence outside of her own testimony and a couple of doctor's prescriptions for commonly-prescribed anti-depressants.[48]   Outside of this scintilla of evidence, the record is absent of

---

[48]   Thompson supplied the Court with copies of two prescriptions for Wellbutrin and one for Amitriptyline.   *See* Pl. Ex. 31.   Thompson testified, however, she was not presently using any

any actual medical evidence that Thompson's failure to repay her student loans over the past eighteen years could be the result of her mental or emotional state.

It would be inappropriate for this Court to endorse a justification on behalf of the debtor for her lack of good faith in repaying her student loans, based solely on her psychological state, with no medical or any other substantive evidence of any current or previous treatments or diagnoses for mental depression.  As one court has aptly stated, "[t]his Court closely scrutinizes claims for undue hardship based upon psychological or emotional disability due to the susceptibility of such claims to fabrication, exaggeration and fraud.  Well qualified and substantiated expert testimony is essential."  *Kelsey v. Great Lakes Higher Educ. Corp.* (*In re Kelsey*), 287 B.R. 132, 136, 143 (Bankr. D. Vt. 2001) (court granted discharge based in large part on corroborating medical evidence presented by the debtor to substantiate her medical claims, including testimony from her psychiatrist that the debtor has been diagnosed with a number of major depressive disorders, that these maladies would prevent her from normal functionality in a work setting, and that the debtor's condition is worsening and incurable).  *See also In re Tirch*, 2005 WL 1311020 (hardship discharge not granted when the only evidence presented at the bankruptcy court level was the debtor's testimony that she was unable to work, which was "unsupported by competent medical or psychological evidence."); *Pobiner v. Educ. Credit Mgmt. Corp.* (*In re Pobiner*), 309 B.R. 405, 419 (Bankr. E.D.N.Y. 2004) (bankruptcy court found that debtor's failure to provide corroborating evidence from a

---

anti-depressants and had not used any such medication since she was last employed.  Tr. at 61, 63.

physician or psychotherapist precluded a hardship discharge based on a mental condition,

stating that "[s]tudent loan debtors claiming undue hardship as a result of a medical

condition must provide evidence to corroborate their claims"); *Daugherty v. First Tenn.*

*Bank* (*In re Daugherty*), 175 B.R. 953, 959 (Bankr. E.D. Tenn. 1994) (student loan debtor

denied a hardship discharge based, to a large extent, on the fact that the record contained

"no proof, other than her own testimony, that she is unable to work"); *Burkhead v. U.S.*

(*In re Burkhead*), 304 B.R. 560, 563-67 (Bankr. D. Mass. 2004) (court denied the

debtor's request for a hardship discharge despite the fact that the debtor produced a 24-

page summary of prior medical history at trial to support her hardship claim, because it

was not convinced, based on its review of her records and because the debtor "did not call

any expert witnesses to testify about her long-term prognosis," that she had a condition

that precluded her from ever earning enough to repay); *Rose v. Educ. Credit Mgmt. Corp.*

(*In re Rose*), 324 B.R. 709, No. 04-6065, 2005 WL 1269315, *2 (8th Cir. B.A.P. June 6,

2005) (court denied medical hardship discharge based in part on the fact that the student

loan debtor had presented "no evidence….that she has health issues that will in the near

future prevent her from working."); *Pace v. Educ. Credit Mgmt. Corp.* (*In re Pace*), 288

B.R. 788, 793 (Bankr. S.D. Ohio 2003) (court refused to discharge debtor's student loans

because the debtor's claims were not "corroborated by testimony or even an affidavit of

any physician or other medical professional, familiar with her condition," noting that "it

is not possible to make a discharge determination without some corroboration of the

medical conditions and how long they will persist"); *Garrett v. N.H. Higher Educ.*

*Assistance Found.* (*In re Garrett*), 180 B.R. 358 (D. N.H. 1995) (finding that even though

the debtor testified that she had been positively tested for multiple sclerosis, there was no medical evidence adduced at trial that multiple sclerosis had been established, and therefore "the evidence on [the debtor's] health condition [was] insufficient to determine whether it will substantially affect her employment in the future.").

The modern trend to require at least some expert testimony to substantiate what otherwise could be self-serving testimony on the part of the debtor, "tacitly reflects the courts' recognition that the reason an expert witness is given testimonial latitude much broader than that granted to a lay witness is that he is assumed to have a 'reliable basis in the knowledge and experience in his discipline.' (citation omitted) Laypersons simply do not have a reliable basis to render a medical diagnosis and prognosis, which are required to support medical hardship discharge claims."  Craig P. Gaumer, *Use Expert Witness Testimony in Student Loan Hardship Discharge Litigation*, 23-9 ABIJ 8 (2004); *See also*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993); *Bugos v. MIT* (*In re Bugos*), 288 B.R. 435, 436-37 (Bankr. E.D.Va. 2003) (court held that because there was no corroborating medical testimony presented at trial, the debtor's testimony regarding her symptoms and predicting whether they will substantially disable her for a substantial period of time was beyond her "knowledge, background, and expertise," and therefore denied discharge of her student loans).

The cases that this Court is aware of that have found discharge appropriate based on medical disability share a common thread that is simply not present in the instant action, being substantial corroborating medical evidence was proffered as to these

disabilities in order to substantiate what would otherwise be merely self-supporting testimony on behalf of the debtor seeking to discharge the debt. *See Dresser v. Univ. of Me.*, 33 B.R. 63, 64-65 (Bankr. D. Me. 1983) (court found student loans should be discharged based on expert medical testimony from a psychiatrist and doctors at the treating hospital, that the student loan debtor, who suffered from delayed posttraumatic stress disorder from his service in Vietnam, had been hospitalized twice, visited a psychiatrist once a week, and took daily medication for depression, headaches, and to enable him to sleep at night, was most likely unemployable due to his condition and could remain that way indefinitely); *Dyer v. Univ. of Tenn.*, 40 B.R. 872, 873-74 (Bankr. E.D. Tenn. 1984) (court held that based on the expert medical testimony and written medical diagnoses introduced, as well as its own observations, that it was "reasonably certain that the debtor cannot possibly cope with full-time employment," and therefore the debtor's student loan debt should be discharged); *Kline v. U.S.*, 155 B.R. 762, 764-65 (Bankr. W.D. Mo. 1993) (court found that student loans of the debtor, who appeared extremely agitated at trial and experienced shaking and jerking, nervous tics and episodes of heavy weeping, should be discharged due in large part to the submission into evidence of various corroborating medical reports, records, and diagnoses of depression, anxiety disorder, and panic attacks, from at least three of her treating physicians); *see also Pena v. Pena* (*In re Pena*), 155 F. 3d 1108, 1113-114 (9th Cir. 1998) (testimony of the debtor, who had been variously diagnosed with "depression, manic depression (bipolar disorder), schizophrenia and paranoia" and had been hospitalized for her mental disabilities, was sufficiently corroborated by evidence of an eight thousand dollar related back disability

award, continuing disability payments, and the letter notifying her she would receive disability payments, to entitle the debtor to a discharge of her student loans); *Binder v. U.S. Dep't of Educ*. (*In re Binder*), 54 B.R. 736, 740 (Bankr. D. N.D. 1985) (finding that a debtor who had been diagnosed with depressive neuroses and bipolar disorder by four psychiatrists and "several psychologists and sociologists," and who had been placed on at least six different forms of medication, including Lithium, was sufficient to prove that the debtor's mental condition sufficiently impacted his ability to "obtain and maintain adequate financial resources during the foreseeable future," and thus his student loan debt was dischargeable); *Nelson v. Pa. Higher Educ. Assistance Agency* (*In re Nelson*), 183 B.R. 972 (S.D. Fla. 1995) (finding that a discharge should be granted in a case where the debtor put on trial testimony from her treating psychiatrist that she had been diagnosed with Recurrent Major Depression with Psychotic Features and slight Paranoia, which was not likely to improve. In granting the debtor's discharge, the court adopted the psychiatrist's testimony that the debtor's condition was not likely to improve and would "prevent her from functioning as a participating member of society and maintaining a job which would allow her to become totally self-supportive."); *Educ. Credit Mgmt. Corp. v. Polleys* (*In re Polleys*), 356 F.3d 1302, 1305-312 (10th Cir. 2004) (discharge upheld where evidence had been presented that the debtor had been diagnosed with a serious psychological condition known as "cyclothymic disorder," and was even once involuntarily committed, was prescribed serious antidepressants and apparently had attempted suicide).

This Court finds that the overwhelming weight of authority on this issue reflects the general rule that a student loan discharge should not be granted based on undue hardship unless there has been some documentary or testimonial corroborating medical evidence proffered to substantiate the claims that the debtor was afflicted with a mental disability, outside of the debtor's own testimony.  Without such substantiating medical evidence, this Court is not qualified to make the determination that any medical disability of Thompson may have prevented her from making a good faith effort to repay her student loans.[49]

Another court described this paradox, which arises with undue hardship litigation involving *pro se* debtors: "On the one hand, this debtor, like many, appeared *pro se*, and lacked the money to pay treating or expert medical professionals to come to court and testify on his behalf. (citations omitted) On the other hand, most judges are laypersons

---

[49] At least one court, however, has suggested that due to the nature of the dischargeability litigation, necessarily involving debtors under the Bankruptcy Code, the testimony of medical experts is a luxury most debtors cannot afford.  *Doherty v. United Student Aid Funds, Inc.* (*In re Doherty*), 219 B.R. 665, 669 (Bankr. W.D.N.Y. 1998).  In this case, the court found, based solely on the debtor's testimony, without any additional supporting medical testimony or evidence, that the debtor suffered from bipolar disorder, which evidenced "additional circumstances" that the debtor's current financial situation was likely to persist for a significant portion of any repayment period and therefore, that the debtor was entitled to a discharge of her student loans.  *Id.* at 669-72.  In reaching this conclusion, the court took judicial notice on a number of matters, including: (1) that "antidepressant drugs often have an effect on manic depressives that exacerbates the condition they are intended to alleviate."  *Id.* at 668.; (2) that there is no known cure for bipolar disorder.  *Id.* at 669.; (3) that the debtor "will have to continue taking lithium to regulate her mental functioning for the rest of her life."  *Id.*; (4) the description of bipolar disorder and its effects, as presented by the National Institute of Mental Health's DEPRESSION/Awareness, Recognition and Treatment ("D/ART") campaign.  *Id.* at 670.; and (5) that "the most probable near-future for a debtor who suffers from a diagnosed and treated manic-depressive disorder is maintenance of the status quo."  *Id.* at 671.  Outside of these matters in which the court elected to take judicial notice, the information available to the court pertaining to the debtor's mental condition and its effects came solely from the debtor's testimony.  *Id.* at 669.

and require some medical evidence to determine the nature, extent and likely duration of a disability." *Norasteh v. U.S. Dep't of Educ.* (*In re Norasteh*), 311 B.R. 671, 678-79 (Bankr. S.D.N.Y. 2004) (where the debtor presented no corroborating medical evidence to support a hardship discharge, the court found that at a minimum, "a borrower seeking 'an undue hardship' discharge must provide corroborative evidence that he had an impairment that prevent[ed] him from earning enough to repay his student loans, and that the impairment is likely to persist well into the future," even though "the Court's own observations of the debtor and consideration of his employment history raise substantial doubt that he will ever earn enough to repay his student loans, and, at the same time, maintain a minimal standard of living, this conclusion is not corroborated by any medical evidence").

Illustrative is *In re Swinney*, a case involving a debtor who contended she had multiple personality disorder and post-traumatic stress syndrome which made it difficult, if not impossible, for her to maintain any sort of permanent employment and greatly impacted her ability to repay her student loan obligations. *Swinney v. Academic Fin. Servs.* (*In re Swinney*), 266 B.R. 800, 803 (Bankr. N.D. Ohio 2001). The court, in denying discharge, found that "the Debtor, beyond her self-supporting statements, did not introduce any evidence of her mental illnesses," and therefore held that "[a]lthough such evidence does not have to necessarily consist of extensive expert testimony, such evidence should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position . . . For example, if properly

authenticated, letters from a treating physician could be utilized." *Id.* at 805 (citation omitted); *see also Chime v. Suntech Student Loan* (*In re Chime*), 296 B.R. 439, 445 (Bankr. N.D. Ohio 2003) (agreeing that "some corroborating evidence must be introduced to substantiate the debtor's position," and that "bare allegations simply will not suffice").

The *Swinney* court additionally noted that " . . . in line with the Congressional policy of making student loans more difficult to discharge, substantial credible evidence must be given which supports the existence of the . . . illness." *Id*. at 805. Thus, while extensive expert medical testimony may not be necessary in the student loan discharge context, this Court finds, as the court in *Swinney* did, that the evidence should consist of "more than simply bare allegations," and some corroborating evidence must be provided to the Court.

By its powers of observation, the Court can note that Thompson is highly emotional and it appeared that she may be somewhat unstable when she testified at trial. However, the Court is neither equipped to be, nor is it appropriate to undertake the role of a psychiatrist or a clinical psychologist in order to determine this issue. The Court must analyze what is placed before it, and the evidence placed before the court is insufficient to make the factual determination that Thompson has suffered from a long-term, serious mental disorder that excuses the lack of any good-faith effort to repay her student loans. The record before the Court simply does not provide a basis for it.

Rather, what the evidentiary record does quite clearly show is that at a number of times over the past eighteen years, Thompson has made a rather substantial amount of money and has effectively repaid nothing towards her student loan. Thompson's

employment history well illustrates that since her graduation in 1987, she has been lucratively employed at least one-half of the time.[50]   While it is uncertain from the evidentiary record before the Court whether the cause of Thompson's inability to make her student loan payments is organic or inorganic, the result is quite clear – <u>six payments in eighteen years</u>.

Thus, the impact that Thompson's mental condition may or may not be having on her ability to make student loan payments is indeterminable by this Court without any substantive evidence to corroborate her testimony.   Without this corroborating evidence, the evidentiary record before the court reflects simply that although Thompson has made a substantial amount of money in the past eighteen years since graduating from New Mexico Tech, perhaps as much as a half a million dollars,[51] she has ignored her student loan creditor almost from the start, she has made virtually no payments on her student loan debt, and in all of this, she supplies the Court with no explanation as to why she has so eschewed her responsibilities to make repayment of her student loans for so long. Therefore, the Court must find that Thompson has failed to carry her burden to prove that she has made a good faith effort to repay her student loan debt, as required by the third prong of the *Brunner* analysis.

---

[50]   Based upon Thompson's Exhibit 1, it appears that in the approximately eighteen (18) years since Thompson graduated from New Mexico Tech in 1987, she had employment earning at least twenty dollars ($20.00) per hour for approximately ten (10) years of this eighteen year period.  In addition, also based on Thompson's Exhibit 1, during the approximately eighteen (18) years since her graduation in 1987, Thompson has had employment earning at least ten dollars ($10.00) per hour for approximately twelve (12) years of this eighteen year period.

[51]   The Court notes that throughout the course of counsel for NMSLGC's cross-examination of Thompson as to her earnings over the past eighteen years, Thompson refused to admit that she has earned as much as a half million dollars since graduating from New Mexico Tech.  *See* Tr. at 49-52.

Because *Brunner* requires that the debtor meet each of its three prongs independently, Thompson's failure to make a good faith effort to repay her loans also necessarily portends that she must fail the *Brunner* student loan dischargeability test in its entirety.

## V.

## SUMMARY

The Court concludes that NMSLGC's student loan debt owed from Thompson remains valid and enforceable. Neither the state statute of limitations, nor the voluntary dismissal of the state court judgment may serve to bar NMSLGC from continuing to pursue collection from its elusive student loan debtor.

The Court further finds that Thompson has failed to sustain her burden of proving, as required by Section 523(a)(8), that she will suffer undue hardship if forced to repay this student loan to NMSLGC.

For the reasons expressed herein, the Court finds the NMSLGC loans are not dischargeable pursuant to Section 523(a)(8) of the Bankruptcy Code and the Complaint of Thompson is therefore dismissed.

A separate order shall issue.

The Clerk shall direct copies of this Memorandum Opinion to Lola P. Thompson,

Pro Se Plaintiff, and to Reginald J. Storment, Esquire, and Kenneth A. Moreno, Esquire,

counsel for NMSLGC.

Entered:

                                        STEPHEN C. ST. JOHN
                                        United States Bankruptcy Judge

The Clerk shall direct copies of this Memorandum Opinion to Lola P. Thompson,

Pro Se Plaintiff, and to Reginald J. Storment, Esquire, and Kenneth A. Moreno, Esquire,

counsel for NMSLGC.

Entered:  7/22/05

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

NOTICE OF JUDGMENT OR ORDER
Entered on docket JUL 2 2 2005